THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
OTIS CLOYD, Defendant-Appellant.

First District (3rd Division)   No. 85—864

Opinion filed January 21, 1987.

Steven Clark and Sue Augustus, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Paula Carstensen, and Frank J. Savaiano, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendant Otis Cloyd was charged with intimidation, aggravated kidnaping, and two counts of attempted murder. A jury found him guilty of attempted murder, but not guilty of intimidation and aggravated kidnaping. The trial court granted defendant's motion in arrest of judgment as to one of the attempted-murder counts, and sentenced defendant to a term of 10 years. On appeal, defendant contends that the instruction given to the jury on the requisite intent for attempted murder was erroneous; that he received ineffective assistance of counsel; and that he was denied a fair trial when the State introduced evidence of another charge pending against him.

Jeanneta Lucas, who was the victim and defendant's ex-girlfriend, testified that she and defendant had known each other for several years. She ended the relationship in November 1983. Neither she nor defendant were heavy drinkers, but at one time defendant used cocaine heavily. On December 4, 1983, defendant broke into her apartment and twice set it on fire. Lucas filed charges as a result of those incidents, and she was the complainant in an aggravated-arson case which was pending against defendant. Lucas stated that she did not see defendant start the fire, but defendant had telephoned her, admitted that he set the fire, and threatened to burn her up. A police officer listened to that conversation. Lucas moved to a different apartment.

On March 5, 1984, when Lucas returned home from work between 5:30 and 6 p.m., defendant was standing at the front doorway of her apartment building. Lucas had seen defendant standing outside her doorway on other occasions, but had never spoken to him. Lucas refused defendant's order to open the door. Defendant drew a gun, but Lucas again refused to open the door. Lucas had never known defendant to carry a gun. Defendant, who was holding onto Lucas' coat, pointed the gun at her stomach. Lucas knocked defendant's hand aside at the moment he fired the gun. The bullet missed Lucas and went into the doorway. They began to struggle, and defendant stated that he was going to kill Lucas and then himself. He began dragging Lucas to an alley east of her doorway. As defendant pulled Lucas into the alley, he placed the gun up to her head and fired again as she continued struggling. Defendant held the gun at her head and fired it a third time, but she knocked his arm aside again. Lucas heard someone call, "Stop, police." Defendant then shot at Lucas a fourth time. She was within arm's reach of defendant, and he was pushing her. Defendant turned and, while crouched in the alley, fired three shots at a police officer, and began to run. Lucas later saw some damage to her doorway and noted that the window was cracked. A police technician testified that there was some damage to the door and glass but no bullet was recovered from the doorway.

Curtis Boyd testified for the State that on March 5, 1984, he was walking down the street when he observed a man who had a woman pinned against the doorway. The man first had the gun behind his back and then put it to the woman's head. Boyd heard the gun fire and ran to a store to call the police.

Officer James Jones of the Chicago police department testified that on March 5, 1984, he and his partner, Ronald Davis, were in plain clothes and were parked in an unmarked car. As Jones left the car to enter a store, he heard a gunshot. He saw defendant and Lucas struggling in a doorway. Defendant had a gun pointed to Lucas' head. Defendant pulled Lucas towards the alley, with the gun a few inches from her head. As Lucas fought to get away, Jones saw defendant shoot the gun a second time. Jones ran towards the pair, identified himself as a police officer and ordered defendant to let Lucas go. Defendant turned at the entrance to the alley, pushed Lucas, and fired at her twice more. Lucas broke loose and defendant ran down the alley. Defendant turned and fired two shots at Jones, who was 20 feet away. Jones jumped back out of the alley and fired three shots at defendant. Officer Davis also approached defendant, and defendant fired at Davis. As defendant ran out of sight, the officers continued

pursuit in a police car. Jones testified that defendant was not swaying and that his hand and arm were steady when he fired the gun. Defendant ran at full stride and turned corners well. He stumbled once, but immediately arose and continued running. Officer Davis corroborated Jones' testimony.

Office Theodore Southerland, a uniformed police officer, testified that he received a radio assist call for shots fired. When he saw defendant running in the alley, Southerland drew his gun. He faced defendant at a distance of 2 feet, and ordered defendant to stop and drop his gun. Defendant obeyed. Defendant did not stumble, stagger, fall, or vomit. Southerland did not smell alcohol on defendant's breath.

Officer Joseph Danzl interviewed defendant at the hospital where he was taken. Defendant stated his name, address, age and date of birth clearly and without hesitation. Although Danzl could smell alcohol, he believed that defendant was only slightly intoxicated because defendant had no problem answering questions. Defendant refused to answer any further questions.

Defendant testified that he had lived with Lucas from 1979 until September 1982, when he was evicted. Both were heavy drug users. Defendant moved back in with Lucas a few months later, and lived with her on and off for another year. He then moved because he had no income and Lucas was seeing another man. They continued to date until December 1983, when defendant stopped seeing Lucas. Defendant did not remember threatening Lucas in December 1983.

On March 5, 1984, defendant went to court in the morning and did not have a gun with him at the time. That afternoon, he drank a half pint of rum and a half pint of vodka. He also injected a gram of cocaine, which gave him only a five-minute high. Later that day, when defendant prepared to go to the barber shop, he released the safety on his gun and took the gun with him. On his way to the barber shop, defendant saw Lucas. Defendant knew her telephone number, but did not know that she lived in the area. Defendant walked up to Lucas and said he wanted to talk. When Lucas refused, defendant pulled out the gun and grabbed her by the collar. Defendant testified that he had been carrying the gun since he was robbed in 1981.

Defendant testified that as he struggled with Lucas in the doorway, Lucas hit his hand and the gun went off. Defendant became frightened, and began pulling Lucas into the alley. As he pulled Lucas, she hit his arm and the gun went off again. Defendant denied that he tried to murder Lucas, and testified that he only wanted to talk to her. Defendant saw a man running towards him, so he let

Lucas go and began running down the alley. He was afraid the man was a friend of Lucas or a "gangbanger." He turned and shot into the air in an attempt to keep the man from chasing him. Defendant stated that he did not aim at the man, and that he did not attempt to murder him. Defendant could not remember how many times he fired the gun while being chased. Defendant saw another man in the alley, but he did not remember shooting at the second man. When defendant saw a uniformed police officer, he stopped and turned over the gun.

Defendant testified that he knew nothing about guns and had not previously fired the gun. Defendant testified on direct examination that his gun was an automatic and did not need to be cocked. On cross-examination, defendant stated that he did not know if the gun needed to be cocked before it could be fired. He also did not know if his gun was automatic or semiautomatic. Defendant always carried the gun with the safety off. The gun was loaded when he bought it. It was stipulated that a .32-caliber, semiautomatic Colt pistol was recovered from defendant.

Dr. Edgardo Correa testified for defendant that he treated defendant in the hospital emergency room. He could smell alcohol on defendant's breath, and a blood test revealed that defendant had a blood-alcohol level of .198. In Dr. Correa's opinion, defendant was intoxicated. Defendant refused to answer questions, but followed the orders of the doctor and nurses.

■ Defendant initially contends that the attempted-murder instruction given to the jury without objection was improper because it permitted the jury to convict defendant of attempted murder on a lesser mental state than a specific intent to kill.

Virtually identical attempted-murder instructions to the one given here, which included the full instruction on murder (Illinois Pattern Jury Instruction, Criminal, No. 7.01 (2d ed. 1981) (IPI Criminal 2d)), have been condemned in numerous cases. (See, *e.g.*, *People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343; *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888; *People v. Jaffee* (1986), 145 Ill. App. 3d 840, 493 N.E.2d 600.) The State concedes that the instruction given was improper, but argues that the error does not require reversal since the evidence of defendant's guilt was overwhelming.

Error in giving instructions will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty. (*People v. Jones*

(1979), 81 Ill. 2d 1, 405 N.E.2d 343.) In *Jones*, the court found the intent to commit murder was blatantly evident from the circumstances, and found the error in the jury instruction to be harmless. We find similarly blatant evidence of defendant's intent to kill Lucas and the police officer in the present case.

Lucas' version of the incident included defendant's prior threats to "burn her up," and his threat to kill her and then kill himself on the day of the crime. Lucas testified that defendant's bullets missed her only because she was struggling to get away, and because she hit defendant's hand several times as he fired the gun at her. Other evidence established that the first bullet struck her doorway, which supported Lucas' testimony. Several witnesses testified that defendant held the gun against Lucas' head.

In addition, Officer Jones offered strong testimony that he identified himself as a police officer and yet defendant shot at him several times. Lucas supported this testimony, as she related that Jones identified himself loudly as a police officer and that the defendant went into a crouched position to aim at Jones. Jones testified that defendant was only 20 feet away when Jones had to jump back out of the alley to avoid being struck by the bullets.

In contrast, defendant's version of the occurrence was incredible. He stated that after releasing the safety, he took his gun with him to the barber shop. Defendant stated that he did not know Lucas' address, yet Lucas testified that she and some neighbors had seen him standing outside her building on several occasions. Defendant testified that he knew nothing about guns, and had never fired a gun. Yet defendant also argues that his marksmanship was such that he could not have missed Lucas if he had intended to kill her. Defendant testified that his gun was an automatic which did not need to be cocked before firing it. However, the parties stipulated that the gun was a semiautomatic. Defendant testified further that he never intended to kill Lucas, but she testified that he had threatened to kill her twice since she ended their relationship. Defendant's testimony that he just wished to talk to Lucas was incredible in the face of witnesses' descriptions of defendant dragging Lucas, holding a gun against her as she struggled to get away, and firing the gun at her four times at close range. The fact that Lucas successfully avoided being shot does not make the evidence closer on the question of defendant's specific intent to kill.

Cases cited by defendant, *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888, and *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28, are distinguishable. Those cases did not evaluate the evi-

dence to determine whether it was so overwhelming as to withstand the damage of the erroneous instruction, and in those cases the intent to kill was highly questionable. *People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343.

We find, therefore, that the evidence on the issue of defendant's intent to kill was not closely balanced. Evidence of defendant's intent to kill was blatantly clear. The error in the jury instruction was harmless. See, *e.g.*, *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *People v. Gore* (1979), 72 Ill. App. 3d 171, 390 N.E.2d 925; *People v. McClure* (1979), 80 Ill. App. 3d 10, 398 N.E.2d 1233.

■ Defendant also contends that it was error to admit evidence of the pending arson charge. Evidence of the other crimes is relevant to establish intent and motive. (*People v. Myles* (1985), 131 Ill. App. 3d 1034, 476 N.E.2d 1333.) The determination of whether evidence of other crimes is relevant to a material issue is within the sound discretion of the trial judge and that determination will not be overturned absent an abuse of discretion. *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 454 N.E.2d 334.

■ In the present case, evidence of the arson charge disclosed a motive behind defendant's actions. We find no abuse of the trial court's discretion where the court limited the evidence and a proper jury instruction was given limiting the purpose for which the evidence could be used. Moreover, further details of the arson incident were brought in on redirect examination of Lucas only after defense counsel opened the door by asking Lucas about whether she had actually seen defendant light the fire.

■ Defendant finally contends that he was denied effective assistance of counsel. Defendant points to defense counsel's failure to make a pretrial motion to limit references to the pending aggravated-arson charge, failure to object to certain evidence or to certain comments made by the prosecutor, failure to object to certain instructions, and raising the issue of defendant's prior drug usage. In order to show ineffective assistance of counsel, defendant first must show that the attorney made errors so serious that he was not functioning as the counsel which defendant is guaranteed by the sixth amendment. Defendant must also show that the deficient performance prejudiced the defense, *e.g.*, but for defense counsel's unprofessional errors, the result of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *rehearing denied* (1985), 471 U.S. 1044, 86 L. Ed. 2d 730, 105 S. Ct. 2715.) There is a strong presumption that the conduct of defense counsel

was within the wide range of reasonable professional assistance. (*People v. Mack* (1984), 105 Ill. 2d 103, 473 N.E.2d 880.) A reviewing court must not look at isolated incidents of conduct. Instead, it must look to the entire record to determine if under all of the circumstances counsel's assistance was ineffective. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.

Defendant maintains that defense counsel failed to move to limit the State's usage of the pending aggravated-arson charge. As we have held, the evidence was admissible. Defense counsel need not make motions which would be unsuccessful. *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270, *cert. denied* (1985), 470 U.S. 1089, 85 L. Ed. 2d 153, 105 S. Ct. 1857.

Defendant also complains of counsel's decision to bring out evidence of defendant's drug usage without presenting expert testimony on the effects of the drug usage on defendant's mental state. After defendant testified that the effects of the cocaine had only lasted five minutes, it would have been a poor trial tactic to further focus the jury's attention on actual drug usage on the day of the shooting. As to drug usage before that day, it was a matter of trial strategy to show a pattern of intoxication and drug usage which might tend to show that the pattern continued on the day of the shooting, thus showing defendant could not have the requisite specific intent to kill. A court will not review counsel's representation when it extends into areas involving the exercise of judgment or trial tactics and strategy. *People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270.

Defendant also argues that defense counsel permitted the prosecutor to misstate the law relating to intoxication during closing argument. The prosecutor did make an incorrect statement, but the trial court instructed the jury to disregard the comment. The prosecutor then made a correct statement, and the jury was given a proper jury instruction on this issue. Defendant sustained no prejudice.

Viewing the record as a whole, defense counsel was not ineffective. Counsel cross-examined the State's witnesses thoroughly; moved for directed findings as to the intimidation and aggravated-kidnaping charges, and later renewed that motion; made numerous objections; and made a thorough closing argument. Furthermore, we have held that the evidence was not closely balanced in this case. There was overwhelming evidence of defendant's guilt. Thus, defendant has failed to show that, but for defense counsel's conduct, the outcome of the trial would have been different.

In defendant's reply brief, for the first time he raises the in-

58

effectiveness of his counsel who was newly retained for the post-trial proceedings. Defendant complains that counsel failed to raise the propriety of the attempted-murder instruction. Defendant concedes that this issue was not raised in his original brief. Supreme Court Rule 341(g) provides that the reply brief should be confined strictly to replying to arguments presented in appellee's brief. 87 Ill. 2d R. 341(g).

Furthermore, defendant's counsel both at the post-trial motion and sentencing hearings was effective. Counsel obtained a trial transcript, and tendered an extensive post-trial motion raising 13 alleged errors to support a claim of ineffective assistance of counsel, and 16 other errors. Counsel argued extensively at the hearing, and his motion in arrest of judgment as to one of the attempted-murder counts was successful. Finally, counsel presented relevant evidence in mitigation at the sentence hearing. Defendant was not denied effective assistance of counsel at trial or the post-trial proceedings.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RIZZI AND WHITE, JJ., concur.