# Illinois Official Reports

## Appellate Court

---

### *People v. Brickhouse*, 2018 IL App (3d) 150807

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAMEKO S. BRICKHOUSE, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0807 |
| Filed | July 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 08-CF-420; the Hon. Kathy S. Bradshaw-Elliott, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Yasaman Hannah Navai, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jim Rowe, State's Attorney, of Kankakee (Patrick Delfino, David J. Robinson, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices McDade and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1     After a jury trial, defendant, Dameko S. Brickhouse, was convicted of two counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2008)) and was sentenced to two concurrent terms of 30 years in prison. On direct appeal, defendant's convictions and sentences were affirmed. *People v. Brickhouse*, 2011 IL App (3d) 100289-U, ¶ 2. Defendant filed a postconviction petition, alleging that he was denied ineffective assistance of trial counsel because trial counsel failed to file a motion to suppress defendant's statements to police. After a third-stage evidentiary hearing, the trial court denied defendant's postconviction petition. Defendant appeals. We affirm the trial court's judgment.

¶ 2                          FACTS

¶ 3     In July 2008, defendant was charged with two counts of armed robbery. The charging instrument alleged that defendant, while carrying a handgun, knowingly took money from the person or presence of Rochelle Hicks (count I) and Jeffrey Hicks (count II) by the use, or threatened use, of force.

¶ 4     In May 2009, defendant's case proceeded to a jury trial. The evidence presented at the trial can be summarized as follows. Rochelle Hicks testified that on July 1, 2008, she and her husband, Jeffrey Hicks, went to a credit union or bank in Bourbonnais, Illinois, where Jeffrey withdrew $1000 from his account to pay bills. Jeffrey gave $500 to Rochelle and kept the remaining $500 for himself. Thereafter, Rochelle and Jeffrey went to a currency exchange in Kankakee, Illinois, so that Jeffrey could pay the electric bill and Rochelle could pay the telephone bill. While in the currency exchange, Rochelle saw defendant and Curtis Phillips walk past the building. Rochelle had known defendant for approximately three years, through her uncle, but had never talked to defendant and had known Curtis for several years. According to Rochelle, on the date of the robbery, defendant was wearing a white T-shirt, blue jeans, and a black White Sox hat.

¶ 5     When Rochelle and Jeffrey left the currency exchange, they started walking toward Jeffrey's sister's house. As Rochelle and Jeffrey were walking down an alley behind some houses, they ran into Curtis, who was alone at the time. Jeffrey and Curtis had a brief conversation. After the conversation ended, Curtis went on his way, and Jeffrey and Rochelle continued down the alley. When they got to about the middle of the alley, defendant jumped out from between two garages with a small silver handgun, which Rochelle also described as a "silver caliber handgun." Defendant pointed the gun at Rochelle and Jeffrey and told them to give him all of their money before he killed them. Jeffrey told Rochelle to give her money to defendant, and Rochelle did so. Jeffrey did not give defendant the remaining $500 that he had in his possession. After defendant received the money, he told Rochelle and Jeffrey to walk away. As they did so, defendant ran up the alley. When Rochelle and Jeffrey got to Jeffrey's sister's house, Rochelle called the police.

¶ 6     At the police station, Rochelle identified defendant from a photographic lineup. Rochelle told the police that defendant had a short silver gun. The police showed Rochelle a photograph of a gun, but Rochelle stated that the gun in the picture was not the gun used in the robbery. Rochelle also identified defendant's hat from a police photograph.

¶ 7	On cross-examination, Rochelle admitted that she received social security payments because she had a learning disability. Additionally, Rochelle admitted that she did not know what a "silver caliber handgun" meant, but Jeffrey had told her the name of the gun.

¶ 8	Jeffrey Hicks testified, similar to Rochelle, that on July 1, 2008, the couple went to a credit union to withdraw some money and then to a currency exchange to pay some bills. After leaving the currency exchange, Jeffrey and Rochelle were walking into an alley to take a shortcut to Jeffrey's sister's house, when they were approached by Curtis. Jeffrey and Curtis had a brief conversation, and then Curtis left and went in the other direction. As Jeffrey and Rochelle continued down the alley, they were confronted by defendant. Defendant jumped out of the bushes, demanded money, and threatened to shoot the couple with a silver-colored handgun. Jeffrey thought that the gun was a .38 caliber. Jeffrey told Rochelle to give her money to defendant, and Rochelle complied. Defendant directed Jeffrey and Rochelle to walk away. As they did so, defendant ran in the opposite direction.

¶ 9	Later, Jeffrey told the police that the assailant wore a black White Sox hat, white T-shirt, and blue jeans. Jeffrey identified defendant from a photographic lineup. On cross-examination, Jeffrey remembered telling the police that the assailant had braids in his hair.

¶ 10	Curtis Phillips testified that he knew defendant, Rochelle, and Jeffrey. On the morning of the robbery, Curtis was walking to the hospital to visit his girlfriend when he met up with defendant on the street. Defendant was wearing jeans and a T-shirt at the time. Curtis and defendant walked together for a while, went past the currency exchange, and then split up and went in their own directions. As they split up, defendant told Curtis that he was "trying to go and hustle up him some money," which Curtis took to mean that defendant was going to try to find some work or some money. Curtis did not see defendant with a gun that day.

¶ 11	Shortly after Curtis and defendant separated, Curtis saw Rochelle and Jeffrey walking behind him. Curtis spoke to Jeffrey briefly and then went on his way. About four or five minutes later, as Curtis was crossing the street, he heard Jeffrey yelling. Curtis looked back and saw Jeffrey, Rochelle, and some other people standing on the street corner calling for the police. Curtis tried to find out what was going on, but the police officer told Curtis to move along. Rochelle and Jeffrey told Curtis that "Dameko" had robbed them. Having been told to move along, Curtis continued on his way to the hospital.

¶ 12	When Curtis returned home from the hospital, he found his uncle and defendant at his house. Curtis's uncle had a construction business. Defendant appeared to have been working, had different clothes on, and had putty on his hands. The police showed up a short time later and took Curtis to the police station, where he identified defendant from a photographic lineup as the person who was with him earlier that day in front of the currency exchange.

¶ 13	After Curtis returned home from the police station, he received a phone call from a person identifying himself as defendant. The person asked Curtis to "see if they want the money back *** so they can drop the charges." About an hour or two later, Curtis had another conversation with defendant. Defendant asked Curtis to talk to Rochelle to see if she would take the money back so that the charges could be dropped. Curtis did not contact Rochelle about the matter, however, because he did not want to get involved.

¶ 14	When asked on the witness stand about whether defendant had braids in his hair on the date of the robbery, Curtis testified that defendant always had his hair cut as it was in court and that he did not remember defendant having braids. Upon further questioning, Curtis

indicated that he cut defendant's hair and that he knew for a fact that defendant did not have braids.

¶ 15    Detective Tim Kreissler testified that on the date of the armed robbery, later in the afternoon, he conducted an audio- and video-recorded interview with defendant. Before the interview began, Kreissler read defendant a *Miranda* form that explained defendant his rights. Defendant indicated that he understood his rights and signed the *Miranda* form.

¶ 16    During Kreissler's testimony, the State introduced the audio and video recording of defendant's interview. Shortly after the start of the recording, a clunk or bang could be heard, the video cut out, and only the audio was available. As the interview continued, Kreissler obtained defendant's name and some background information. Kreissler asked defendant for permission to record the interview. Defendant stated that he did not do anything wrong and told Kreissler that Kreissler could call defendant's parole officer.[1] Kreissler again asked for consent to record the interview. Defendant consented but then stated to Kreissler, "I can't ask for a lawyer?" The following conversation ensued:

> "KREISSLER: Well, we'll get to that point, but um we're not at that point yet. Right now we're just getting over whether we're gonna, you know, audio and video, so just sign there—you said, yeah, we can audio-video it—and then we'll read you your rights, which we'll get to that point [inaudible].
>
> DEFENDANT: Read me my rights? I ain't did nothing.
>
> KREISSLER: Well, you just said, you know, can you have your lawyer present. If you didn't—[pause].
>
> Dameko, put your initials there, where it says that, yes, we can audio and video it."

Kreissler then read defendant his *Miranda* rights, including the warning that defendant had the right to an attorney and that one would be provided for him if he could not afford one. In total, about 30 seconds had passed from the point where defendant had made the question or comment about a lawyer and the point where Kreissler had read defendant his *Miranda* rights. After the statement of each right, Kreissler asked defendant if he understood the right, and defendant indicated affirmatively. Kreissler confirmed that defendant could read and then told defendant that he could read the *Miranda* rights form again if he wanted to do so. Defendant placed his initials next to the statement of each right and then signed the form without saying anything further about a lawyer.

¶ 17    After the rights form had been completed, Kreissler stepped out of the interview room for a moment, realized that the video had cut out, and then he and another person came back into the interview room and spent a few minutes fixing the video. The interview proceeded at that point and was both audio- and video-recorded. During the remainder of the first interview, defendant denied that he had committed the armed robbery. Defendant told Kreissler that at the time of the offense, he was doing drywall work with Curtis's uncle at a house near the intersection of Cottage Avenue and Chestnut Street. At one point in the interview, Kreissler made comments to defendant about working and about there being some type of stains or marks on defendant's person. Kreissler was asked further about those comments during his

---

[1]Although not quite clear from the record, it appears that the portion of the recording where defendant mentioned parole may have been redacted and not played for the jury to hear.

- 4 -

testimony at trial and stated that at the time of the interview, defendant had plaster or drywall material on his pants and on his forearms. The stains or marks that Kreissler was referring to in his testimony were clearly visible on defendant's person in the video.

¶ 18   Later in the day on July 1, 2008, Kreissler conducted a search of defendant's bedroom. Inside the bedroom, Kreissler found a black White Sox hat, a black BB gun, and five $20 bills. Kreissler and another detective photographed the items that had been discovered.

¶ 19   On July 2, 2008, Kreissler interviewed defendant a second time. Defendant refused to allow the interview to be recorded but signed a *Miranda* waiver form and agreed to speak to Kreissler. During the interview, defendant allegedly told Kreissler he was sorry that he had robbed Rochelle and Jeffrey. Defendant indicated that he would give the money back and turn the gun over to the police if the charges were dropped. Kreissler responded that he could not make any kind of deal like that with defendant.

¶ 20   On cross-examination, defense counsel questioned Kreissler thoroughly about inconsistencies in the victims' statements and in their descriptions of the person who had robbed them; about Kreissler's failure to follow standard procedure, to reduce defendant's second statement to writing, and to have defendant read and sign a written copy of his second statement; about the lack of an investigation of the scene of the robbery and the lack of physical evidence (the gun); and about the fact that Curtis was released without charge, even though he had lied to police and even though Kreissler and the victims suspected that Curtis may have been involved in the armed robberies.

¶ 21   Police officer Robin Passwater testified that he attempted to interview defendant a third time on July 3, 2008, about the location of the gun used in the robbery. Defendant asked Passwater to reduce the charges in exchange for his signature on the *Miranda* waiver form. Passwater told defendant that only the state's attorney could change the charges. Defendant indicated that he could retrieve the gun but did not tell Passwater where the gun was located. Ultimately, defendant refused to sign the *Miranda* waiver form.

¶ 22   On cross-examination, defense counsel questioned Passwater extensively about Passwater's conversation with defendant, about omissions in Passwater's report relative to that conversation, about Passwater's failure to recover the gun used in the instant offenses despite defendant's alleged claim that he knew where the gun was located or could obtain the gun, about Passwater's failure to reduce defendant's third statement to writing and to have defendant read and sign a printed copy of that statement, and about Passwater's failure to recommend that the prosecution negotiate with defendant to try to get the gun used in the instant offenses off the street.

¶ 23   After being duly admonished, defendant elected not to testify at the trial and presented no further evidence.

¶ 24   Following closing arguments, the case proceeded to deliberations. During the deliberations, the jury asked two questions. In one of the questions, the jury requested, and was allowed to review, several items, including defendant's audio- and video-recorded interview. In the other question, the jury requested to review the police reports of Kreissler and Passwater. The trial court denied that request. After about two hours of deliberations (including any time spent reviewing the items requested), the jury found defendant guilty of both counts of armed robbery.

¶ 25      In June 2009, defense counsel filed a motion for new trial, which was subsequently amended. The motion alleged, among other things, that a new trial was warranted because defendant believed that counsel had made a mistake in failing to move to suppress defendant's statements to the police. The following month, defendant sent an *ex parte* letter to the court, which made various allegations of ineffective assistance of trial counsel.

¶ 26      At a later hearing on the motion for new trial, the trial court read defendant's letter into the record as the court inquired into defendant's claims of ineffective assistance. The following conversation ensued:

"THE COURT: *** The second issue is my lawyer also failed to suppress the statement of the police officer's statement and testimony saying that I called Curtis Phillip[s] to get the gun back used in the crime, which even Phillips denied himself, and that I confessed to committing this offense because it is hearsay. And there is absolutely no evidence corroborating any of this. All right.

How about the motion to suppress his statement?

[DEFENSE COUNSEL]: Okay. I did not do a motion to suppress any of the three different statements that were—were done. And, specifically, the two that he's talking about were the further statements where the police went back to him and took—and talked to him and wrote down what they said he said. They were not actual statements made by him and signed. They were not video statements. So at that point we simply had police officers' reports saying we went back and talked to him and this is what he said. And I did not attempt to suppress any of those statements.

THE COURT: Is there a reason why? I guess I—

[DEFENSE COUNSEL]: I guess because they appeared to be voluntary on his part. In other words, Mirandized but not—not to the extent of his first statement, which was voluntarily Mirandized and agreed to videotaping. Then the second one he didn't agree to the videotaping. And the third one he kind of said, look, I don't want to talk to you guys anymore. Then they wrote that down.

They appeared to be more or less those two statements in the nature of the police reports. There wasn't a sup—an actual statement of the defendant to suppress such as a written statement that we believed he had not made or that was not Mirandized. And I did not attempt to suppress those.

THE COURT: Okay. Basically because you didn't think they were statements that would—could be suppressed. Is that what you're saying?

[DEFENSE COUNSEL]: I didn't believe there was a basis to suppress them at the time prior to it going to trial.

THE COURT: And those are the last two. Is that right, versus the first one?

[DEFENSE COUNSEL]: Right, the last two. I don't know that there was—if—if—if he's claiming a failure to suppress the first one, I—

* * *

Judge, if he—if he has a problem with that, if this encompasses all of the them, the reason I didn't attempt to do that is because, one, there was a consent; and, two, I actually thought it was probably to my client's benefit for the jury to see that statement. Because in it he was saying he didn't do it, consistently giving places,

- 6 -

times, and was covered with plaster, dust and material from the job that he claimed he had been at. And I believed it was as exculpatory as it was inculpatory."

¶ 27     At the conclusion of the hearing (on a subsequent date), after having had an opportunity to review the transcripts, the trial court denied the motion for new trial, stating that it did "not find there [was] any neglect here based on the evidence presented in this case." In response to a question by defendant and some further discussion, the trial court commented:

"And in all the cases it's not the defendant that makes the decision on a motion to suppress, it's always the defense attorney. And I'm assuming you [defense counsel] had a reason for not doing that.

Last time you said you just didn't believe there was a basis for it I believe, as I look at my notes here. You said you didn't attempt to suppress the first one because it was to [defendant's] benefit, as [the prosecutor] has responded. [Defendant] was saying he couldn't have done this crime because he was painting with this Alfred Phillips and when he was arrested he had on clothing that looked like there was plaster or paint spots. And as to the other two statements you did not believe there was a basis to suppress and I believe that is trial strategy. And that's up to you to do."

¶ 28     Following a sentencing hearing, the trial court sentenced defendant to two concurrent terms of 30 years in prison. We affirmed defendant's convictions and sentences on direct appeal. *Brickhouse*, 2011 IL App (3d) 100289-U, ¶ 2.

¶ 29     In August 2011, defendant filed a *pro se* postconviction petition. In the petition, defendant alleged, among other things, that he received ineffective assistance of trial counsel when counsel failed to move to suppress his statements to police. The trial court summarily dismissed the petition in the first stage of review. We reversed that decision on appeal and remanded the case for further proceedings on defendant's postconviction petition. *People v. Brickhouse*, 2013 IL App (3d) 110584-U, ¶ 2. One justice dissented in that decision. *Id.* ¶¶ 34-38 (Schmidt, J., dissenting).

¶ 30     On remand in the trial court, defendant was appointed an attorney to represent him on the postconviction petition. The attorney amended the petition,[2] and the petition was docketed for second-stage proceedings. The State filed a motion to dismiss the petition, which the trial court later denied. In so doing, the trial court stated:

"As I reviewed the people's motion to dismiss, basically cited the dissent in the appeal which reversed my summary dismissal of the PC. And I have to look at the second stage whether there's some showing—a substantial showing of constitutional violation. I'm going to let it go to the third stage because you cited—not that I disagree with you, but I can't go with the dissent at this point."

After denying the State's motion to dismiss, the trial court scheduled the case for a third-stage evidentiary hearing on defendant's postconviction petition.

¶ 31     At the evidentiary hearing, the testimonies of defendant, Kreissler, and defense counsel were presented. Defendant testified that he was asking for an attorney when he made the statement to officer Kreissler about a lawyer, but the police did not call an attorney for him.

_____
[2]In the amended petition, postconviction counsel alleged that appellate counsel was also ineffective for failing to raise on appeal trial counsel's failure to file a motion to suppress.

Defendant continued to talk to the police after that point. On cross-examination, when defendant was questioned further about the matter, he stated:

> "I asked him [Kreissler] about a lawyer. I thought he was gonna go get a lawyer or stop the interview like what he supposed to do but when he didn't, I didn't want—he the police. I didn't want to do anything wrong."

Defendant acknowledged, however, that Kreissler told defendant that they would get to that and that Kreissler had defendant read and sign a paper that had defendant's rights listed on it, including the right to have an attorney present. Defendant acknowledged further that after he was read his *Miranda* rights, he never stated that he wanted an attorney. According to defendant, he did not do so because he "had already asked [Kreissler]."

¶ 32    Police officer Kreissler testified that he had been a Kankakee police officer for 13 years and had been trained in interrogation. Kreissler had learned from his training that after a suspect was advised of his *Miranda* rights, if the suspect said anything about an attorney, the interview was to be terminated immediately. When Kreissler was interviewing a suspect, he followed a set procedure, starting with obtaining written consent from the suspect to have the interview recorded. In this particular case, at the outset of the first interview, as Kreissler was asking defendant for consent to record the interview, defendant made the statement to Kreissler about a lawyer. Kreissler interpreted defendant's statement to mean that defendant was not sure of his rights and that he wanted an explanation of his rights. Kreissler told defendant that they would get to that. The next thing that Kreissler did was "[get] to that" by reading defendant the *Miranda* warning form. Kreissler did not interpret defendant's statement as a request for an attorney and confirmed that, after he advised defendant of his *Miranda* rights during the first interview, defendant did not request an attorney.

¶ 33    Defense counsel testified that she remembered that defendant had made a claim or claims of ineffective assistance of counsel against her but did not remember what they were about and did not remember anything about her decision not to file a motion to suppress. At one point, when defendant's postconviction attorney objected to the State's questioning of defendant's trial counsel as leading, the trial court stated: "That's trial strategy. Overruled. It's a [p]ost-conviction."

¶ 34    At the conclusion of the evidentiary hearing on the postconviction petition, the trial court took the case under advisement. The trial court later issued a written decision denying defendant's petition for postconviction relief. In doing so, the trial court found that defendant's statement or question about a lawyer was ambiguous and noted the context in which the statement was made—that the statement was made during the officer's attempt to obtain consent to record the interview and prior to defendant being read his *Miranda* rights. The trial court also noted that defendant's trial counsel had testified that the decision not to file a motion to suppress the recorded statement was made on the basis of trial strategy because the recorded statement corroborated defendant's alibi (defendant had dry wall on his hands, arms, and clothing). The trial court pointed out that defendant never confessed during the recorded statement. The trial court also found that there was no prejudice to defendant from trial counsel's failure to file a motion to suppress because, had the motion been filed, it would have been denied. Defendant appealed.

ANALYSIS

¶ 36 On appeal, defendant argues that the trial court erred in denying his postconviction petition after a third-stage evidentiary hearing. Defendant asserts that the petition should have been granted because defendant established a substantial deprivation of his constitutional rights in that his trial counsel provided ineffective assistance when she failed to move to suppress his statements to the police. Defendant asserts further that his second and third statements were highly incriminating, that there was no tactical or strategic reason for not moving to suppress the statements, that he was likely to prevail on the motion to suppress because the interviewing officer proceeded to question defendant after defendant invoked his right to an attorney, and that the result of his trial would have likely been different if his statements had been suppressed. Defendant asks, therefore, that we reverse the trial court's ruling, that we grant his petition for postconviction relief, and that we remand this case for a new trial on the underlying criminal charges before a different trial judge.

¶ 37 The State argues that the trial court's ruling was proper and should be upheld. The State asserts that defendant did not make an unequivocal request for an attorney during the initial police interview; that the police officer did not violate defendant's *Miranda* rights by proceeding to interview defendant after that point; that trial counsel was not deficient in failing to file a motion to suppress; and that any alleged error that occurred did not affect the outcome of this case because the evidence of defendant's guilt, even without defendant's statements, was overwhelming. The State asks, therefore, that we affirm the trial court's denial of defendant's postconviction petition.

¶ 38 The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)) provides a three-stage process for the adjudication of postconviction petitions. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006). In the third stage of the process, the trial court conducts an evidentiary hearing, and the defendant must show by a preponderance of the evidence that he suffered a substantial violation of his constitutional rights in the proceedings that produced the conviction or sentence being challenged. See *id.* at 472-73; *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22. In a third-stage evidentiary hearing, the trial court acts as the finder of fact and resolves any conflicts in the evidence, determines the credibility of witnesses, and decides the amount of weight to be given to the testimony and other evidence presented. See *Williams*, 2017 IL App (1st) 152021, ¶ 22. When a petition is advanced to a third-stage evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse the trial court's ruling unless it is manifestly erroneous; that is, unless it is against the manifest weight of the evidence. See *Pendleton*, 223 Ill. 2d at 473; *People v. Rapp*, 343 Ill. App. 3d 414, 417 (2003). A ruling is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record or if the ruling itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 39 In this particular case, defendant's postconviction claim of error was based upon trial counsel's alleged ineffective assistance in failing to file a motion to suppress defendant's statements to police. A claim of ineffective assistance of counsel is analyzed under the two-pronged, performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that defense counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant to

the extent that he was deprived of a fair proceeding. *Id.* A defendant's failure to satisfy either prong of the *Strickland* test prevents a finding of ineffective assistance of counsel. *Id.* In reviewing a claim of ineffective assistance of counsel, a court must consider defense counsel's performance as a whole and not merely focus upon isolated incidents of conduct. See *People v. Cloyd*, 152 Ill. App. 3d 50, 57 (1987). A strong presumption exists that defense counsel's conduct was within the wide range of reasonable professional assistance and that all decisions were made in the exercise of reasonable professional judgment. *Id.* at 56-57; *People v. Martin*, 236 Ill. App. 3d 112, 121 (1992). In addition, matters of trial strategy will generally not support a claim of ineffective assistance of counsel, even if defense counsel made a mistake in trial strategy or tactics or made an error in judgment. *Patterson*, 217 Ill. 2d at 441; *People v. Perry*, 224 Ill. 2d 312, 355 (2007). "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Perry*, 224 Ill. 2d at 355-56.

¶ 40   More specifically as to motions to suppress, the decision of whether to file a motion to suppress is generally a matter of trial strategy and not subject to a claim of ineffective assistance of counsel. See *Martin*, 236 Ill. App. 3d at 121. In order to establish prejudice resulting from defense counsel's failure to file a motion to suppress, a defendant must show a reasonable probability that (1) the motion to suppress would have been granted and (2) the outcome of the trial would have been different had the evidence been suppressed. *Patterson*, 217 Ill. 2d at 438. In other words, defense counsel's failure to file a motion to suppress does not establish incompetent representation, if the motion would have been futile. *Id.* Although the failure to file a motion to suppress is generally not a basis for an ineffective assistance of counsel claim, the failure to file a motion to suppress statements may constitute ineffective assistance of counsel if there is some indication that the statements were truly involuntary. *Martin*, 236 Ill. App. 3d at 121-22.

¶ 41   Defendant's ineffective assistance of counsel claim in the instant case was based upon defendant's contention that had trial counsel filed a motion to suppress, defendant's incriminating statements to police would have been suppressed because the statements were taken in violation of defendant's right to counsel in that they were taken during custodial interrogation after defendant had clearly invoked his right to an attorney. It is well established that to protect an accused's fifth amendment right against self incrimination, the police must advise a criminal suspect who is subject to custodial interrogation of his rights under the fifth and fourteenth amendments—the *Miranda* rights or *Miranda* warnings—before questioning the suspect about alleged wrongdoing. See *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966); *People v. Winsett*, 153 Ill. 2d 335, 348 (1992). After being read the *Miranda* warnings, if the suspect indicates that he wishes to remain silent, the police must end the interrogation. *Miranda*, 384 U.S. at 445; *Winsett*, 153 Ill. 2d at 349. If the suspect invokes his right to counsel in response to the *Miranda* warnings, the police must stop the interrogation until an attorney is present and may not reapproach the suspect for further interrogation until counsel has been made available to the suspect. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda*, 384 U.S. at 444-45; *Winsett*, 153 Ill. 2d at 349. If the police later initiate communication with the suspect in the absence of counsel (assuming there has been no break in custody), any statements made by the suspect are presumed to be involuntary and are inadmissible as substantive evidence at trial. *Winsett*, 153 Ill. 2d at 349. In addition, any waiver of the right to counsel given by a suspect in a further

discussion initiated by the police is presumed to be invalid, and statements obtained pursuant to such a waiver are inadmissible in the prosecution's case in chief. *Id.* at 350. The purpose of that rule is to prevent the police from badgering a defendant into waiving his previously asserted *Miranda* rights. *Id.*

¶ 42 In applying the above legal principles, a court must determine whether an accused—now a defendant—clearly invoked his right to counsel. The test is an objective one. *People v. Schuning*, 399 Ill. App. 3d 1073, 1082 (2010). At a minimum, to invoke the right to counsel, a defendant must articulate his desire for an attorney to the police in a clear enough manner—free from indecision or double meaning—that a reasonable officer under the circumstances would understand the statement to be a request for an attorney. *People v. Harris*, 2012 IL App (1st) 100678, ¶ 69. If a defendant's alleged request for an attorney is ambiguous or equivocal such that a reasonable officer under the circumstances would understand only that the defendant might be invoking the right to counsel, the police are not required to stop questioning the defendant. *Schuning*, 399 Ill. App. 3d at 1082. Furthermore, although there are no specific words that a defendant must use to invoke the right to counsel, the mere mention of a lawyer or an attorney by a defendant to the police is insufficient. *People v. Howerton*, 335 Ill. App. 3d 1023, 1025 (2003). As noted above, to avoid difficulties of proof and to provide guidance to police officers conducting interrogations, the determination of whether an accused actually invoked the right to counsel is made using an objective standard. *People v. Quevedo*, 403 Ill. App. 3d 282, 293 (2010).

¶ 43 In the present case, after having reviewed the record, we find that the trial court properly denied defendant's postconviction petition following a third-stage evidentiary hearing. We reach that conclusion for several reasons. First, in the factual context of the present case, we agree with the trial court that defendant's question or comment about a lawyer was ambiguous and was not a clear request for an attorney. See *Davis v. United States*, 512 U.S. 452, 454-55 (1994) (upholding the lower courts' finding that the petitioner's remark to law enforcement agents, "Maybe I should talk to a lawyer," was not a request for counsel); *United States v. Shabaz*, 579 F.3d 815, 816-19 (7th Cir. 2009) (finding that the defendant's question, "[A]m I going to be able to get an attorney?" which was asked in a hallway at the police station prior to interrogation and prior to the defendant being read his *Miranda* warnings was not a clear request for counsel under the circumstances); *United States v. Wysinger*, 683 F.3d 784, 788-96 (7th Cir. 2012) (finding that the defendant's initial question, "Do I need a lawyer before we start talking?" which was asked at the outset of the interrogation before the defendant was read the *Miranda* warnings did not constitute a clear, unambiguous, and unequivocal request for an attorney under the circumstances, although later statements by the defendant did constitute such a request); *Lord v. Duckworth*, 29 F.3d 1216, 1220-21 (7th Cir. 1994) (finding that the defendant's statement, "I can't afford a lawyer but is there any way I can get one?" which was made after the *Miranda* warnings had been given to the defendant twice and after the defendant had already made a lengthy recorded confession was not a clear and unequivocal request for an attorney under the circumstances); *People v. Krueger*, 82 Ill. 2d 305, 307-09, 311-12 (1980) (finding that the defendant's comment, "Maybe I ought to have an attorney," "Maybe I need a lawyer," or "Maybe I ought to talk to an attorney," which was made during the course of interrogation after the police officers had read the defendant the *Miranda* warnings, had questioned the defendant about several burglaries, and had started to question the defendant about his

- 11 -

involvement in a stabbing death was not a clear invocation of the right to counsel). In the instant case, defendant asked the question about a lawyer at the outset of the interview as officer Kreissler was attempting to obtain consent from defendant to record the interview. Defendant's question or comment was made before officer Kreissler had read defendant the *Miranda* warnings and before Kreissler had started asking defendant questions about the suspected offense. Under the circumstances of the present case, applying an objective standard, defendant's question or comment about a lawyer did not constitute a clear invocation of the right to counsel that would have required officer Kreissler to stop questioning defendant until an attorney was present. See *Miranda*, 384 U.S. at 444-45; *Winsett*, 153 Ill. 2d at 349; *Davis*, 512 U.S. at 454-55, 462; *Shabaz*, 579 F.3d at 816-19; *Wysinger*, 683 F.3d at 788-96; *Lord*, 29 F.3d at 1220-21; *Krueger*, 82 Ill. 2d at 307-09, 311-12.

¶ 44   In reaching that conclusion, we note that we have reviewed the cases cited by defendant in support of his assertion to the contrary and find the facts of those cases to be distinguishable from the facts of the present case. In most or all of the cases cited, the defendant's alleged request for an attorney was made just after the defendant was given his *Miranda* warnings and, taken in context, was a much clearer indication of the defendant's desire to have an attorney present than in the instant case. See *Smith v. Illinois*, 469 U.S. 91, 92-97 (1984) (finding that defendant's statement, "Uh, yeah. I'd like to do that," which was made immediately after the police had advised defendant of the right to an attorney was a clear and unequivocal invocation of the right to counsel); *United States v. Lee*, 413 F.3d 622, 623-27 (7th Cir. 2005) (finding that defendant's statement, "Can I have a lawyer?" which was made just after the police had read the *Miranda* warnings to the defendant and had inquired whether the defendant was willing to talk to them was a clear and unequivocal request for an attorney and an invocation of the right to counsel, although any alleged error that resulted from the admission of the defendant's confession was ultimately harmless); *Howerton*, 335 Ill. App. 3d at 1024-27 (finding that the defendant's statement during interrogation that he either wanted to terminate the interview or wanted an attorney, which was made after defendant had been read the *Miranda* warnings and had been told that he was under arrest, was a clear an unequivocal invocation of his right to counsel); *United States v. Hunter*, 708 F.3d 938, 943-48 (7th Cir. 2013) (finding that the defendant's statement, "Can you call my attorney?" which was made to a police officer while the defendant was in custody at the hospital and after the defendant had been read the *Miranda* warnings was an unambiguous and unequivocal invocation of the right to counsel); *Schuning*, 399 Ill. App. 3d at 1086-90 (finding that the defendant's statement requesting to use the telephone to call his attorney, which was made while defendant was in custody at the hospital and while police interrogation was imminent, was an unambiguous invocation of the right to counsel). Suffice it to say, those are not the factual circumstances of the present case.

¶ 45   Second, in the instant case, police officer Kreissler appropriately responded to defendant's question or comment about a lawyer, even though under the law Kreissler was not required to do so (see *Davis*, 512 U.S. at 461-62) and told defendant that they were not at that point yet in the interview, that he was going to get to that point, and that he would be reading defendant his *Miranda* rights. Within about 30 seconds after defendant's question, Kreissler did, in fact, read the *Miranda* rights to defendant, including the right to have an attorney present during the interview. Defendant indicated that he understood those rights;

placed his initials next to the statement of each right; signed the *Miranda* form; and agreed to talk to the police, without making any further mention of an attorney.

¶ 46    Third, in the present case, there is no indication that defendant's statements to the police were truly involuntary. See *Martin*, 236 Ill. App. 3d at 121-22. Indeed, defendant has not claimed as much.

¶ 47    Fourth, we agree with the trial court that the determination whether to file a motion to suppress in the present case was an exercise of trial strategy by trial counsel and was not, therefore, subject to a claim of ineffective assistance of counsel. See *id.* at 121. Trial counsel indicated at the hearing on defendant's motion for new trial and on defendant's claims of ineffective assistance that she did not move to suppress the first statement, which had been recorded, because it was beneficial to defendant's case in that it corroborated defendant's alibi defense. As for defendant's second and third statements, trial counsel indicated that she did not move to suppress those statements because, in her opinion, there was no basis to do so since defendant had been *Mirandized* and the statements did not appear to be involuntary. Furthermore, as the record clearly indicates, this is not a case where defense counsel failed to conduct meaningful adversarial testing of the State's case. See *Perry*, 224 Ill. 2d at 355-56.

¶ 48    Fifth, for the reasons set forth above, we also agree with the trial court that it is not likely that defendant's trial counsel would have prevailed on a motion to suppress the statements had such a motion been filed. See *Miranda*, 384 U.S. at 444-45; *Winsett*, 153 Ill. 2d at 349; *Davis*, 512 U.S. at 454-44, 462; *Shabaz*, 579 F.3d at 816-19; *Wysinger*, 683 F.3d at 788-96; *Lord*, 29 F.3d at 1220-21; *Krueger*, 82 Ill. 2d at 307-09, 311-12. Thus, defendant is unable to establish any prejudice from trial counsel's failure to file a motion to suppress the statements that defendant made to police. See *Patterson*, 217 Ill. 2d at 438.

¶ 49    Sixth and finally, based upon the record in this case and the applicable legal principles as set forth above, we conclude that the factual findings made by the trial court after the third-stage evidentiary hearing were well supported by the record and the legal determinations made by the trial court were consistent with the current state of the law on the issues presented. We do not agree with defendant's assertions to the contrary. To a large extent, defendant places too much reliance on this court's previous ruling in this case—where a majority of this court held essentially that defendant's *pro se* postconviction petition was sufficient to state the gist of a constitutional claim. See *Brickhouse*, 2013 IL App (3d) 110584-U, ¶¶ 2, 26. In making that ruling, the court majority found that "[u]nder the lower standard of review of a first-stage postconviction petition, defendant's statement [about a lawyer], viewed in light of the instant scenario, could be construed as an invocation of defendant's right to counsel." *Id.* ¶ 29. In a third-stage postconviction proceeding, however, which is what is currently before this court in the instant appeal, the allegations in the postconviction petition are no longer taken as true and the defendant must prove by a preponderance of the evidence that he suffered a substantial violation of his constitutional rights. Compare *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (stating the legal rules that apply in a first-stage postconviction proceeding), with *Williams*, 2017 IL App (1st) 152021, ¶ 22 (stating the legal rules that apply in a third-stage postconviction proceeding). As the trial court implicitly found, defendant failed in that burden here.

¶ 50                          CONCLUSION

¶ 51        For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 52        Affirmed.