**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 200492-U

Order filed September 5, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0492 Circuit No. 09-CF-861 |
| LEE K. PONSHE, | ) ) ) | Honorable Daniel Rippy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Holdridge and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    The court did not err in dismissing defendant's postconviction petition at the second stage.

¶ 2    Defendant, Lee K. Ponshe, appeals from the second-stage dismissal of his postconviction petition. Defendant argues that the Will County circuit court erred in dismissing his petition because the petition made a substantial showing that: (1) he received ineffective assistance of trial counsel where counsel failed to file a motion to suppress statements made to the police, and (2) the court exhibited judicial bias that deprived defendant of a fair trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          On April 30, 2009, defendant was charged by indictment with first degree murder (720

ILCS 5/9-1(a)(2) (West 2008)). The indictment alleged that defendant caused the death of 18-

month-old H.B. by striking her on the head, knowing that his act created a strong probability of

death or great bodily harm.

¶ 5          Prior to trial, the State moved to admit evidence of what it claimed to be defendant's

prior bad act against a different child in a wholly different manner by presenting a live

demonstration of a parachute deploying from a race car that purportedly injured the child. One

similarity between the two incidents was the age (18 months) of the two alleged victims. Defense

counsel objected only to a live demonstration. After viewing the demonstration in person, the

court permitted the State to enter a video recording of the parachute deployment into evidence

and it allowed the mother to testify for the State relative to the occurrence itself and a defense

expert to explain the manner of deployment.

¶ 6          The evidence at trial regarding the charged incident showed that on April 12, 2009, Jessie

Evans left her daughter, H.B., with her then fiancé, defendant. When Evans returned home at

approximately midnight, H.B. was still awake and had a bruise on her cheek. Defendant said the

bruise was caused by H.B. falling off a toy. The next day, H.B.'s bruise was still visible. Evans

drove to defendant's residence with H.B. There, defendant placed several of Evans's belongings

in a crawl space. At approximately 6 p.m., Evans left the residence to run errands. At 7 p.m.,

defendant called Evans. While speaking, Evans heard H.B. crying. Defendant thought he left the

crawl space access open and ended the call to check. A minute later, defendant called Evans back

and reported that H.B. had fallen into the crawl space and was sitting on her bottom. When

Evans returned home at approximately 8 p.m., she did not notice any new injuries on H.B.

Defendant put H.B. to bed. Around midnight, Evans checked on H.B. before going to bed. H.B. was sleeping, and Evans did not hear H.B. the remainder of the night.

¶ 7   When Evans awoke the morning of April 14, defendant reported that H.B. had been awake since 4 a.m. Evans observed that H.B. had a swollen lip that had not been there the night before. H.B. ate breakfast and ran errands with Evans and defendant. When they returned, H.B. napped. Evans played with H.B. after her nap. At approximately 5 p.m., Evans put H.B. down for a second nap. Just after 7 p.m., defendant yelled that H.B. was not breathing. Evans observed that H.B.'s lips were blue and began CPR. H.B. was pronounced dead when she arrived at the hospital.

¶ 8   On April 15, 2009, Detectives Wayne Ratajack and Denise Powers interviewed defendant. The State admitted the video recorded interview into evidence and published it to the jury. During the interview, defendant explained that while moving Evans and H.B. into his house, he placed some of their belongings in the crawl space. Later that day, he heard a scream coming from the floor and discovered H.B. in the crawl space crying. Ratajack informed defendant that the autopsy indicated that H.B. did not die from a fall in the crawl space and suggested that defendant unintentionally hurt H.B. Ratajack acknowledged that defendant raising his four-year-old son and a new fiancée and infant in his home likely caused defendant stress. Initially, defendant told the detectives that he had "no idea" what happened to H.B. and that he did not touch H.B. "abnormally" or in the "wrong way." Ratajack stated, "[y]ou could sit there and deny it all you want, but the sooner you *** release it, all that, all the *** stress and all the stomach upset that's all gonna go away, it's gonna be relieved." Defendant stated he was upset that his son was taken from him that day. The following exchange occurred:

3

"POWERS: I know you were freaking out and you were scared when she fell in that hole. *** I would of lost it myself, ok? *** Alright, and I know this is outta character for you, it just happened, you know what I mean? And, like you said, we gotta work with you now on this.

DEFENDANT: I'm gonna go to jail for the rest of my life.

\* \* \*

RATAJACK: You're putting the cart before the horse. If we work this out, *** if the truth comes out and *** we can show a reasonable jury of *** your peers a reasonable reason why yeah this man's a great guy and but, but for a second there he snapped. ***

POWERS: We're not about breaking everybody up, ok, this is a tragedy in itself we wanna keep the families together. We're not about tearing it apart, alright, we're here to work with ya. *** You seem like a good guy, you're hard working, you know. You got the kid. I wanna see everything back together for you, I don't wanna see it all torn up. We're not about that.

RATAJACK: [Defendant], we're trying to help you. *** [W]e're throwing you a life raft here."

Defendant stated that he did not "remember doing it." Ratajack pointed out that defendant had not slept since he moved H.B. and Evans into the house until the day H.B. died. Powers stated, "I know you're young, *** you've been through a lot in your short little twenty something years of life. You got the back injury." Defendant responded, "Yeah, and I'm gonna spend the rest of my life in fucking prison." Ratajack reminded defendant that he was "putting the cart way before the horse." Ratajack continued,

4

"Help yourself by telling the truth and, *** instead of going up and have us paint you as that monster that hurt this little girl, ok and we don't want to do that, because we don't think it's true, but if we go in and, and we go, yeah he says he didn't do it, but this is what the evidence shows, man he must be some cold hearted dude because he just, ya know, he must have meant to do it. *** [T]hat's the two choices we have here."

Defendant disclosed that he was up with H.B. all night, and she would not stop crying or fall asleep. Later, defendant asked "[h]ow long am I gonna be in prison for?"

"RATAJACK: Nobody's saying you're going to prison for any length of time.

POWERS: *** [L]ets get beyond the whole thing that happened.
***

RATAJACK: *** [U]ntil we know what happened, we can't make any judgments like that. We can't answer those questions. *** [U]ntil you tell us the truth. We're truth seekers here.

POWERS: You've got this huge heart and I can see it. *** Until you get beyond this and, and admit to what happened, this is gonna eat you up, ok, there's no doubt in my mind. *** Alright, like I said, I don't wanna break you and your son up at all. I wanna try to get everybody back together, ok, and the sooner we get beyond this, the sooner we can do that, alright?
***

DEFENDANT: I must've, I must've done it. I must've done it.

* * *

5

RATAJACK: *** You just gotta tell us why. You just gotta tell us how, and it'll all be over. You'll feel 100 percent better, this'll be beyond you, and then we start building your life back up again. ***

DEFENDANT: My life's ruined.

RATAJACK: Your life is not ruined. Once again, you're overboard, you're swimming in the water right now. You're floundering. We're throwing you a life raft. *** All you gotta do is just tell us what happened ***.

* * *

POWERS: *** You tried to get her to sleep. Was she laying down in the bed *** when you hit her? Did you have her up in your arms? I mean, what happened?

DEFENDANT: She was laying down. I walked in there, extremely half asleep. I was rubbing her head and then she started screaming louder, and all I did was, *** I like, smacked her one time, like ya know—what did I do?

***

DEFENDANT: Oh my god, I'm a fucking murderer."

After his admission, defendant began crying and stated, "Oh my god, what did I do? Oh my god." Defendant did not remember how many times he hit H.B., but believed it was at least two times. Defendant demonstrated how he hit H.B. by knocking on the table. Defendant indicated that after hitting H.B. he asked himself "[W]hat the fuck did you just do? What did you just do ***? You just hit a little girl." Later, defendant stated that H.B. fell into the crawl space the day before she died, but that he hit H.B. on the head the night before she died.

¶ 9         Dr. Lucy Rorke-Adams, a pediatric neuropathologist, testified that, following her review of H.B.'s autopsy, the crime scene evidence, and other evidence, she observed bruising to H.B.'s face, forehead, and left ear, and a cut to her lip. Rorke-Adams explained that H.B. had sustained a "considerable nonaccidental injury" consistent with having incurred "several blows to her head," which caused her death. Further, the injuries Rorke-Adams observed were inconsistent with a fall into the crawl space, as she opined that it would be impossible to receive the "multiple bruises" H.B. had to the top and back of her skull unless she "d[ove] into the crawl space," which would "be extremely unusual for a child" to do. Moreover, that type of fall would not have caused H.B.'s death. Rorke-Adams concluded that H.B. had been abused and received the injuries within 24 to 48 hours of her death.

¶ 10        Rachel Eggleston testified that in June 2008, she was in a romantic relationship with defendant. She and her 18-month-old son, T.W., lived with defendant and his son. One night, defendant woke Eggleston around midnight and indicated that T.W. was walking around the garage and had accidentally deployed a parachute from defendant's race car. The parachute hit T.W. on the side of his face. Eggleston observed a large bruise and swelling on the side of T.W.'s face that had not been there earlier that night. T.W. was not able to communicate what happened but appeared "shook[ ]." Defendant advised Eggleston against taking T.W. to the hospital because it would cause custody issues. If Eggleston decided to take T.W. to the hospital, defendant suggested that she inform the hospital staff that T.W. fell off a toy. In the days following the incident, Eggleston observed that T.W. would not go near defendant and appeared "scared of [defendant]."

¶ 11        A witness described the spring and parachute mechanism that is deployed from a race car to enable the car to stop. The State admitted and published to the jury the video recording

7

addressed in the pretrial motion *in limine*, which showed a stationary race car deploying a parachute. When the spring released the parachute, the parachute dropped to the floor approximately a foot from the rear of the car.

¶ 12    Defense counsel called Dr. Larry Blum, a forensic pathologist, who testified as an expert witness following his review of H.B.'s autopsy. Blum was unable to conclude H.B.'s cause of death. Specifically, Blum could not say with a "reasonable degree of medical certainty" that H.B. died from blunt force trauma to her head or that the injuries were caused intentionally. Blum opined that one injury could have been from a fall. Blum believed that a forensic neuropathologist or an individual trained in pediatrics would be better suited to review this case. On cross-examination, Blum agreed that the swelling of H.B.'s brain caused her death but could not say what had caused the swelling. Additionally, Blum knew Rorke-Adams to have a "very good reputation," and deferred to Rorke-Adam's opinion as he did not hold the same qualifications.

¶ 13    Dr. Jamie Jacobson, a neuropathologist, testified as an expert witness that he also reviewed H.B.'s autopsy. Jacobson opined that H.B.'s death was not caused by trauma because he did not observe other evidence of edema or brain swelling. On cross-examination, Jacobson acknowledged H.B.'s other abnormal bruising and hemorrhaging but could not testify regarding the cause of those injuries. Jacobson also knew Rorke-Adams to be a "very well-regarded" pediatric neuropathologist.

¶ 14    John Lawson, a body shop owner, testified that he had been involved in racing cars for 40 years. Lawson viewed defendant's race car and parachute mechanism, which Lawson identified as a "pilot chute which is spring loaded" and a "regular parachute." Lawson indicated that the pilot chutes were "pack[ed] *** as tight as you can. *** [T]hen you load your spring, and put

your cable in which holds it all in place." Lawson was aware of instances in which a pilot chute could "go off inadvertently," such as "bump[ing]" or "pull[ing] that cable." Lawson identified defendant's parachute exhibit as the "same type of pilot chute" as located on defendant's race car. Defense counsel asked Lawson whether the spring was compressed to the race car and used to expel the parachute. Defense counsel asked, "[a]nd you would want to compress it like this, *** so it would shoot out, correct[,]" and demonstrated the release of the spring and parachute against the witness stand. The State objected, and the court excused the jury to discuss the objection.

¶ 15     The State noted that it had asked permission in a pretrial hearing to allow the jury to see an in-person demonstration of the parachute being deployed in place of the video but defense counsel had objected. Further, the State argued that defense counsel's demonstration was an "unfair representation of any action *** based on the sound and the object that it was hitting." Defense counsel responded that the demonstration "accurately reflects how the spring operates." The court stated,

> "[T]his wasn't a demonstration that the Court was aware you were going to do. You didn't ask to do it, and it's nowhere near what I saw on that video.
>
> What you did is compress that spring against your stomach, walk up to the witness stand which is solid wood that I probably couldn't break *** with a sledge hammer and then *** released it so that it slammed up against the front of the witness stand and made an extremely loud noise."

The State suggested that the court instruct the jury that

> "the State had made a motion *** to allow the jurors to see the parachute deployed in person, the defense had objected, and the Court limited the

9

presentation of the evidence to a video; that the in-court demonstration by [defense counsel] was done without the permission of the Court and was improper.

You should disregard any impressions that you may have had from that demonstration as it is not representative of how the parachute deploys and that *** everything is stricken."

Defense counsel argued that his demonstration was "exactly how the spring is deployed" but did not object to the instruction. The court continued,

"I haven't heard any evidence that any spring has ever deployed against what amounts to a stone wall, and that's the sound it made.

I remember when we had this motion earlier—and we all went out to view this in the county warehouse where it is being stored ***. ***

*** We all went out there, and it sounded like nothing. There was no explosion, and I have been told that what I thought was an explosion on those cars on TV is actually the wind catching the parachute.

What you did without the Court's permission or requesting it with no advance motion whatsoever was to make it sound like an explosion because you stood at most three feet away from that witness stand.

Without the Court's permission, you approached the witness, and then without the Court's permission engaged in your own experiment and demonstration; and it sounded like an explosion which is nothing at all like the way this deploys.

10

So that is an impression in the jurors's [*sic*] minds that I don't know if we can get out with just an admonition."

In response, counsel argued that it was an accurate demonstration for how the spring would have "come out in a very fast, violent manner and it can certainly cause injuries to an 18 month old child."

¶ 16　　　　The court found that counsel should have offered the demonstration to the court prior to the jury demonstration. The court instructed the jury:

"[T]he objection of the State is sustained, and I want to further state to you that sometime [*sic*] ago the State made motion to take the entire jury out to the scene of the race car and allow you to see in person the parachute deploy actually from the car. The defense objected to that, and I, therefore, limited the presentation of the evidence you heard on that parachute to the video that you saw earlier in this trial.

The in-court demonstration and experiment by [defense counsel] was done without the permission of the Court, and it was totally improper.

You should disregard any impressions you may have from that demonstration, including any noise that was created. It is not representative of how the parachute deploys, and it is not evidence in this case, all right?"

The court suggested that defense counsel coordinate and present a live demonstration of a parachute deploying from a race car, but defense counsel rested without presenting additional evidence on the matter. The jury found defendant guilty of first degree murder.

¶ 17　　　　On January 3, 2013, defendant filed a motion for a new trial that argued, *inter alia*, that the circuit court erred in its jury instruction regarding defense counsel's parachute

11

demonstration. The court denied defendant's motion and sentenced defendant to a term of life imprisonment.

¶ 18    On direct appeal, defendant argued that (1) trial counsel was ineffective for allowing the jury to hear a recorded conversation between defendant and his father, (2) the circuit court abused its discretion by refusing to issue an involuntary manslaughter jury instruction, and (3) defendant's sentence was unconstitutional. *People v. Ponshe*, 2015 IL App (3d) 130152-U, ¶¶ 33, 39, 46. We affirmed defendant's convictions and remanded for resentencing. *Id.* ¶ 56. The circuit court resentenced defendant to 75 years' imprisonment.

¶ 19    On December 19, 2019, defendant filed a postconviction petition alleging three claims of ineffective assistance of trial counsel and that the court infringed on his right to a fair trial. Relevant to this appeal, defendant argued ineffective assistance of appellate counsel for failing to argue on appeal the ineffective assistance of trial counsel for not filing a motion to suppress defendant's statements following promises of leniency from his recorded interview. Defendant also claimed that the court committed "judicial misconduct" when it admonished the jury regarding defense counsel's parachute demonstration, and, according to defendant, essentially stated that "[t]he State wanted to show you the real deal here *** but [the court] didn't let them. And now the tricky defense lawyer is trying to pull one over on you," denying defendant his right to a fair trial. The petition did not allege that appellate counsel was ineffective for failing to raise an issue with the court's comments on direct appeal. The court advanced defendant's petition to the second stage, and the State filed a motion to dismiss. Following arguments, the court dismissed defendant's petition finding the ineffective assistance claims were without merit and defendant forfeited review of his right to a fair trial claim. Defendant appeals.

¶ 20    II. ANALYSIS

12

¶ 21 On appeal, defendant argues that the circuit court erred by dismissing his postconviction petition because it made a substantial showing (1) of ineffective assistance of trial counsel for failing to move to suppress defendant's statements made during his police interview as involuntary,[1] and (2) that the court exhibited judicial bias when it "announced to the jury that defendant had tried to mislead it," thus denying defendant his right to a fair and impartial jury.

¶ 22 At the outset, we would be remiss if we did not note the inadequacies of defendant's brief on appeal. Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires that the statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment." However, defendant has failed to include in his statement of facts *any* facts related to his postconviction petition, which is the subject of this appeal. The statement of facts does not contain what allegations defendant raised in his postconviction petition, at what stage the petition was dismissed, or why the court dismissed the petition. Moreover, the argument section is convoluted and conflates the legal analysis from the dismissal of a postconviction petition with that of a direct appeal. Additionally, defendant failed to replicate his postconviction arguments here. Therefore, our review is limited to what we can glean from defendant's argument.

¶ 23 The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a three-stage process for a criminal defendant to challenge his conviction based on an allegation that his constitutional rights were violated. *People v. Cotto*, 2016 IL 119006, ¶ 26. If the petition advances to the second stage, the circuit court must determine whether defendant has made a substantial showing of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

---

[1]Defendant does not raise issues concerning the court's dismissal of his other two ineffective assistance of counsel claims.

A petition may be dismissed at the second stage "only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Hall*, 217 Ill. 2d 324, 334 (2005). A petitioner's allegations are taken as true unless the record affirmatively refutes the allegations. *People v. Domagala*, 2013 IL 113688, ¶ 35. At the second stage, defendant bears the burden of making a substantial showing of a constitutional violation. *Id.* We review the dismissal of a second-stage postconviction petition *de novo*. *Hall*, 217 Ill. 2d at 334.

¶ 24  "[A] postconviction proceeding is not a substitute for a direct appeal, nor is it a second direct appeal." *People v. Harris*, 224 Ill. 2d 115, 128 (2007). Instead, a postconviction proceeding is a collateral attack affording limited review of constitutional matters not previously adjudicated. *People v. Greer*, 212 Ill. 2d 192, 203 (2004). Issues that could have been raised on direct appeal, but were not, are procedurally defaulted or forfeited. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 25                               A. Ineffective Assistance

¶ 26  Defendant argues that he made a substantial showing of ineffective assistance of trial counsel due to counsel's failure in moving to suppress defendant's involuntary statements. Specifically, defendant asserts that the detectives advised "[d]efendant that he [would] receive certain benefits if he agree[d] to incriminate himself." Defendant continues that only after detectives stated that they did not "want to break [defendant] and [his] son up," did defendant make "an incriminatory statement," that he "must've done it."[2]

---

[2]While defendant generally referenced "incriminatory involuntary statements" made in his interview with police, defendant identified only one statement in his argument. Therefore, we understand this to be the only statement defendant contests and find that it is beyond the issue brought on appeal to determine what other statements made by defendant were implicated and whether counsel should have moved to suppress any additional statements. See *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29.

¶ 27        A criminal defendant is guaranteed the right to the effective assistance of counsel under both the United States Constitution and the Illinois Constitution. *People v. Hale*, 2013 IL 113140, ¶ 15. To succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires defendant to show that (1) his attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance resulted in prejudice. To establish prejudice, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). "A defendant's failure to establish either prong of the *Strickland* test prevents a finding of ineffective assistance of counsel." *People v. Brickhouse*, 2018 IL App (3d) 150807, ¶ 39. The decision to file a motion to suppress is generally "a matter of trial strategy and not subject to a claim of ineffective assistance of counsel." *Id.* ¶ 40. However, to establish prejudice for counsel's failure to file a motion to suppress,

> "a defendant must show a reasonable probability that (1) the motion to suppress would have been granted and (2) the outcome of the trial would have been different had the evidence been suppressed. [Citation.] In other words, defense counsel's failure to file a motion to suppress does not establish incompetent representation, if the motion would have been futile." *Id.*

¶ 28        The test for determining voluntariness " 'is "whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." ' " *People v. Richardson*, 234

15

Ill. 2d 233, 253 (2009) (quoting *People v. Slater*, 128 Ill. 2d 137, 160 (2008), quoting *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996)). We must look at the totality of the circumstances, where no single factor is dispositive. *Id.* The factors to consider include (1) defendant's age, intelligence, background, experience, mental capacity, education, and physical condition; (2) the legality and duration of the detention; (3) the presence of *Miranda* warnings; (4) the duration of the questioning; and (5) any physical or mental abuse, including threats or promises. *Id.* at 253-54.

¶ 29     We find that defendant did not make a substantial showing of ineffective assistance of trial counsel for failing to file a motion to suppress. First, we find that defense counsel's decision not to file a motion to suppress amounted to trial strategy. See *Brickhouse*, 2018 IL App (3d) 150807, ¶ 40. By choosing to have defendant's interview shown, counsel could have intended to show the jury defendant's emotional response, that he was not affirmative about killing H.B., and that he only made any statements because he wanted to be sure he would see his son. Defense counsel could have thought this would make defendant more sympathetic to the jury.

¶ 30     Second, defendant failed to show a reasonable probability that the motion to suppress would have been granted or that, if it was granted, it would have changed the outcome of the proceedings. Notably, defendant cites only one factor to support his contention that his statement was involuntary, where police asserted that they did not want to "break" defendant and his son up. He does not even argue that any of the other above factors apply and has, thus, failed to prove that his statement was involuntarily compelled or induced. See *Richardson*, 234 Ill. 2d at 253; *Brickhouse*, 2018 IL App (3d) 150807, ¶ 40. Additionally, defendant asserts only one statement was involuntary, that defendant said he "must've done it." He does not argue that his statements wherein he detailed how he "smacked" H.B. and stated he was "a fucking murderer" were involuntary. Therefore, these statements would have been admitted.

16

¶ 31        Moreover, the evidence of defendant's guilt was overwhelming. Here, defendant was awake with H.B. late into the night while she cried and refused to fall asleep. Defendant explained that while H.B was lying down, he "was rubbing her head and then [H.B.] started screaming louder," and defendant "smacked her" at least two times. Defendant also demonstrated how he hit H.B. by knocking on the table. Defendant expressed his belief that he would be sent to prison "for the rest of [his] life," and stated, "Oh my god, I'm a fucking murderer" because he "hit a little girl." The remaining evidence at trial showed that H.B.'s injuries were inconsistent with H.B. having fallen into the crawl space, as defendant originally reported. Specifically, Rorke-Adams testified that H.B. suffered from a severe nonaccidental brain injury causing her death, with the injuries consistent with "several blows to [H.B.'s] head." While defendant's two experts made differing conclusions about the extent and intentional nature of H.B.'s injuries, the experts failed to directly impeach Rorke-Adams, where they could not refute her conclusions as a possibility. Notably, Rorke-Adams held specialized training as a pediatric neuropathologist in examining deceased children's brains that neither of the defense experts held. Both experts highly regarded Rorke-Adams in her profession. Therefore, defendant's "I must've done it" statement would not have changed the outcome of the proceedings. Accordingly, this claim was properly dismissed.

¶ 32                           B. Judicial Bias

¶ 33        Defendant alleges that the circuit court exhibited bias when it "announced to the jury that defendant had tried to mislead it." Defendant also contends that the court's "treatment of defense counsel denied him a fair trial." Defendant relies on the court's statements to defense counsel outside the presence of the jury and the court's jury instruction following counsel's evidentiary demonstration.

17

¶ 34        Initially, we acknowledge that forfeiture is less rigidly applied where the basis for the objection is the conduct of the circuit court. *People v. Hudson*, 195 Ill. 2d 117, 123 (2001) (the principles of fundamental fairness do not require that we ignore the procedural bar for conduct of the trial court). In the present case, defendant's judicial bias claim was unpreserved where defense counsel did not object when the State and court proposed the instruction, nor was the issue raised on direct appeal.[3] See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appellate review, a defendant must object to it at trial and raise it in a posttrial motion); see also *Hudson*, 195 Ill. 2d at 123. Additionally, defendant did not argue ineffective assistance of appellate counsel for failure to raise this claim on appeal, defendant's claim of judicial bias raised in his postconviction petition is not based on new evidence unknown to defendant during his previous appeal, nor has he alleged that his efforts to raise this claim earlier were impeded. See *People v. Jackson*, 205 Ill. 2d 247, 276 (2001).[4]

¶ 35        Notwithstanding this forfeiture, defendant cannot show that the court exhibited judicial bias. A judge is presumed to be impartial even after extreme provocation. *People v. Hall*, 114 Ill. 2d 376, 407 (1986). To sustain a postconviction claim of judicial bias, a defendant must establish

---

[3]Defendant attempts to avoid forfeiture by arguing for application of the *Sprinkle* doctrine and requesting first-prong plain error review. Both doctrines apply specifically to forfeiture principles in a direct appeal. See *People v. Sprinkle*, 27 Ill. 2d 398, 400-01(1963) (proper preservation will be relaxed on *direct* appeal where defense counsel's failure to object relates to the circuit court's conduct in front of a jury); see also *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007) (plain error review applies to issues raised on *direct* appeal that were not properly preserved in the circuit court by failing to object at trial and raise the issue in a posttrial motion).

[4]In his ineffective assistance of trial counsel analysis, defendant also suggested that the court erred in permitting the admission of the parachute incident at trial and failing to provide the jury a limiting instruction. This claim is troubling because it does appear that, in its effort to prove this was a "prior bad act" the State was allowed to essentially conduct a "trial within a trial," creating a fairly blatant due process issue and a strong possibility that defendant was convicted based on the alleged parachute incident and not the incident for which he was actually on trial. However, defendant did not explain or even address his failure to bring this claim on direct appeal, argue the ineffective assistance of appellate counsel for failing to raise the issue on direct appeal, nor present a cohesive argument on appeal regarding the issue in this appeal. Thus, defendant's argument is forfeited. *Supra* ¶ 24.

a "nexus between a judge's corruption and the judge's conduct at *** trial." *People v. Fair*, 193 Ill. 2d 256, 263 (2000). We assume that judges, regardless of their personal backgrounds and experiences in life, will be able to set aside any biases or predispositions they might have and consider each case in light of the evidence presented. *People v. Tye*, 141 Ill. 2d 1, 25 (1990). "[O]nly under the most extreme cases would disqualification for bias or prejudice be constitutionally required." *People v. Coleman*, 168 Ill. 2d 509, 541 (1995). Allegations of judicial bias must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *People v. Hannon*, 48 Ill. 2d 462, 464 (1971). A judge's displeasure with counsel's behavior is not a basis for automatic recusal. *People v. Steidl*, 177 Ill. 2d 239, 265 (1997).

¶ 36      Here, defendant alleged that the court's comments "forced the jury to believe the State's evidence *** and *** that Defense counsel sought to deceive[ ] both the judge and the jury." However, defendant has presented no facts which indicate that he was prejudiced by the court's "rage." Evaluating the court's reaction to defense counsel in the context of the proceedings, the court's displeasure was grounded in valid frustration. The State raised the issue of presenting the parachute evidence in a pretrial motion *in limine*. The parties viewed the live demonstration and a video demonstration. Defense counsel objected to all demonstrations and did not provide any alternative options. The court ruled that the jury would be shown the video *in lieu* of a live demonstration at trial. Given the court's pretrial ruling, it is clear that the court was not only alarmed by defense counsel's manner of demonstration but also that counsel chose to demonstrate this particular piece of evidence. The record shows that the court immediately excused the jury to discuss the State's objection to defendant's presentation. Following this, the court's comments directly to defense counsel outside the presence of the jury and the proposed

19

jury instruction addressed defense counsel's display of that specific piece of evidence. These facts, at most, illustrate the court's irritation with defense counsel and not defendant himself, nor did it indicate to the jury that the court was biased. See *Hannon*, 48 Ill. 2d at 464; *Steidl*, 177 Ill. 2d at 265. It is also worth noting that the circuit court gave defense counsel the opportunity to contribute to the jury instruction and to present a live demonstration of a parachute deployment in his case-in-chief after striking the in-court demonstration but defense counsel chose not to do so. Defendant has not overcome the strong presumption of the court's impartiality and, thus, failed to establish a claim of judicial bias that resulted in prejudice against him. Therefore, we affirm the circuit court's denial of defendant's second-stage postconviction petition.

¶ 37                                III. CONCLUSION

¶ 38        The judgment of the circuit court of Will County is affirmed.

¶ 39        Affirmed.