2025 IL App (1st) 231047-U

No. 1-23-1047

Order filed January 15, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 18935 |
| | ) | |
| DESTEPHANO FLYNN, | ) | Honorable |
| | ) | Neera Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court's second-stage dismissal of defendant's postconviction petition is affirmed where defendant failed to make a substantial showing that (1) his trial counsel provided ineffective assistance by (a) not investigating and calling a known witness and (b) not filing a motion to suppress his inculpatory statement based on *Gerstein v. Pugh*, 420 U.S. 103 (1975), and (2) he had a "valid claim" that his inculpatory statement should have been suppressed because he was arrested based upon an investigative alert.

¶ 2     Defendant Destephano Flynn, who was convicted of first degree murder and attempted first

degree murder, appeals from a circuit court order granting the State's motion to dismiss his petition

for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). On appeal, defendant contends that the circuit court erred in dismissing the petition where he "had a valid claim" of ineffective assistance of trial counsel and "had a valid claim" that his right against unreasonable searches and seizures was violated. For the reasons that follow, we affirm.[1]

¶ 3     The underlying facts of the case were set forth in our opinion on direct appeal affirming defendant's convictions. See *People v. Flynn*, 2012 IL App (1st) 103687. Due to the nature of defendant's postconviction claims, we repeat some of those facts here.

¶ 4     Defendant's convictions arose from an August 4, 2001, shooting during a dice game at a Chicago park in an area that the Dog Pound street gang claimed as its territory. Jermaine Collins, a drug dealer and member of the Unknown Vice Lords street gang, was shot several times and died. Billy Taylor was also shot as he fled the scene but survived.

¶ 5     In 2007, defendant was arrested and charged with the first degree murder of Collins, the attempted first degree murder of Taylor, aggravated battery with a firearm, and aggravated discharge of a firearm. The State's theory of the case was that Collins was shot eight times by Dog Pound members defendant, Deon Coleman, Robert Holly, and a fourth, unknown man, and that Taylor was shot multiple times by Gregory Matthews and codefendant Darius Epting, who were also Dog Pound members.

¶ 6     Simultaneous jury trials were held for defendant and Epting in October 2010. At defendant's trial, the evidence established that, at 4:29 a.m. on the day in question, the police

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

responded to a call of a person shot. Collins's dead body was found face-down in a grassy area of the park. The police were notified that a second shooting victim had driven himself to the hospital. Cartridge cases, fired bullets, and bullet fragments recovered at the scene indicated that multiple weapons were used with multiple calibers of ammunition made by different manufacturers. An autopsy revealed that Collins had eight gunshot wounds: five in his head, one in his neck, one in his back, and one in his leg. Bullets and bullet fragments of varying calibers were recovered from Collins's brain, neck, cheek and chest.

¶ 7    Shooting victim Taylor testified that, at the time of the shooting, he was playing a dice game at the park. When he initially spoke to the police, he did not admit that he knew the shooters because he was afraid for the safety of his family, who lived in the neighborhood. Taylor did, however, tell the police that defendant and Henry Clark were at the dice game.

¶ 8    In 2003, two years after the shooting and during an unrelated investigation, a confidential informant spoke with Taylor, who admitted that he knew more about the shooting than he had told the police. That information was given to Detective John Madden of the cold case unit of the Chicago police department in October 2006. After the investigation was reopened, an investigative alert was issued for Taylor, who was located on April 6, 2007. By this time, Taylor and his family had moved to the suburbs, so Taylor cooperated with the police. Taylor identified codefendant Epting as the person who shot him in the back. Taylor also identified defendant and Deon Coleman as the people who shot at Collins.

¶ 9    Taylor testified that he learned about the dice game at the park from Henry Clark and arrived at the park around 9 or 10 p.m. Defendant, codefendant Epting, Clark, Collins, and some of Collins's friends were also present. After five or six hours, the game started to wind down. Only

Taylor and Collins were still playing; the others had drifted off to the side as they lost money. Then Deon Coleman, a person Taylor had never seen before, came from behind a parked car, pointed a gun at Collins's head, and started shooting at Collins and chasing him. Taylor saw defendant come from behind the car holding a gun, "cut [Collins] off," and shoot him. Taylor ran in the opposite direction. As codefendant Epting chased Taylor, Taylor heard gunshots and was shot in the back. Epting was only three or four feet behind Taylor at that time.

¶ 10     Taylor explained that initially he thought the attack was a robbery, so he dropped his money and his watch as he ran. However, Epting kept chasing Taylor and the shooting continued, so Taylor realized the attack was more than a robbery. Taylor tried to fight Epting, who pointed the gun at Taylor's head. Taylor put both his hands up in front of his face and Epting fired the gun. The bullet went through the palm of Taylor's right hand. When Taylor did not hear any more gunshots, it seemed that Epting's gun either jammed or was out of bullets because Epting ran away. Taylor ran to his car and drove to the hospital.

¶ 11     When Henry Clark was interviewed in prison by Detective Madden and an assistant state's attorney, he was serving a seven-year sentence for aggravated battery with a firearm. He also had several more felony convictions for domestic battery and criminal damage to property. He agreed to testify and was not promised anything in return for his cooperation. He stated that he was a member of the Dog Pound street gang along with defendant, codefendant Epting, Robert Holly, Deon Coleman, and Gregory Matthews. Although Clark got along with Collins, the other members of the Dog Pound had problems with Collins because he was making money selling drugs in the park. Defendant also had conflicts with Collins that stemmed back to when they were both incarcerated together.

¶ 12    Clark testified that at the time of the shooting, he had been playing dice with defendant, codefendant Epting, Collins, and Taylor. Some people in the game were getting angry because they were losing money and people started leaving. When defendant lost all his money, he and Epting left the game. Clark said defendant was a sore loser. Epting was also angry, but he did not lose as much money as defendant. About five minutes after defendant and Epting left, Clark heard his nephew whistle from a block away as a warning. Then Robert Holly and defendant ran up, shooting at Collins. Epting fired toward Taylor and chased him. There was another shooter at the scene, but he wore a hooded sweatshirt, so Clark could not see his face. Clark ran to his car and started to drive away but was flagged down by Epting. Clark gave Epting a ride and saw that he had blood on his shirt and was acting nervous.

¶ 13    Clark testified that he spoke with defense investigator Mary Clements in 2010. He did not want to talk to her about Dog Pound business so he initialed changes she made to his grand jury testimony just to get rid of her. He did not pay attention to what she wrote on the transcript or crossed out. Clark stated that his grand jury testimony was truthful and denied telling Clements that defendant was not one of the shooters.

¶ 14    Mary Clements testified about her meeting with Clark. She corrected his grand jury statement to reflect what he told her, *i.e.*, that after defendant and codefendant Epting lost their money at the dice game, they left. According to Clements, Clark stated that when the shooting started, he saw only Robert Holly's gun and started running so that he would not get shot; Clark did not see defendant or codefendant Epting.

¶ 15    Chicago police detective John Madden testified that he was working in the cold case unit when he was assigned to the case. On April 16, 2007, he interviewed Taylor and showed him a

photo array. Taylor identified Epting as the man who shot him and identified defendant and Coleman as having shot at Collins. Madden then interviewed Clark. Following these conversations, the police issued investigative alerts for defendant and Epting on August 2, 2007.

¶ 16    Detective Madden questioned defendant after his arrest on August 10, 2007. Defendant's videotaped statement was published to the jury.[2] According to that statement, defendant left the park and went home and slept. Codefendant Epting and Robert Holly came to defendant's house after leaving the dice game and woke him up. They told him that they wanted guns because Collins "got to go," which defendant understood to mean that Collins had to die. Defendant kept guns hidden in a hollowed out teddy bear. He put a .22-caliber revolver in his pocket and gave codefendant Epting a .38- or .357-caliber gun. Holly had a .357-, .44- or .45-caliber revolver. Epting and Holly left defendant's house, and defendant took his time before following them back to the park because he hoped the shooting would be over by the time he got there.

¶ 17    When defendant arrived at the park, he saw Holly shoot Collins. Defendant admitted firing his gun once or twice in Collins's direction but claimed that he was not trying to hit Collins and did not know whether he actually hit Collins. Defendant also admitted that he saw codefendant Epting and Gregory Matthews shoot at Taylor. Defendant also saw Holly go to Collins and shoot him at close range in the head.

¶ 18    The jury found defendant guilty of first degree murder and attempted first degree murder and for personally discharging a firearm during each crime. Codefendant Epting was acquitted by his jury. Defendant was sentenced to a total of 66 years in prison, which consisted of consecutive

---

[2]The video recorded statement is not included in the record on appeal. Our description of the content of the statement is taken from our opinion on direct appeal.

sentences of 20 years for the murder plus 20 years for personally discharging a firearm during that murder, and 6 years for the Class X offense of attempted murder plus 20 years for personally discharging a firearm during that attempted murder.

¶ 19    On direct appeal, defendant contended that the State failed to prove beyond a reasonable doubt that he was guilty of the attempted murder of Taylor under general accountability principles or the common-design rule because the shooting of Taylor was not an act in furtherance of the planned killing of Collins and defendant did not assist codefendant Epting in shooting Taylor. He also contended that the trial court erred by adding the 20-year firearm sentencing enhancement, based on his personal discharge of a firearm, to both his murder and attempted murder convictions. Defendant argued that his enhanced sentences were void because the statutes establishing the firearm sentencing enhancements were ambiguous concerning whether the enhancement applies only to the principal offenders who actually inflicted a gunshot wound on the victim or also applies to accountable codefendants. We affirmed. *Flynn*, 2012 IL App (1st) 103687.

¶ 20    On September 30, 2014, defendant filed a *pro se* petition for postconviction relief under the Act. On December 8, 2014, the circuit court advanced the petition to the second stage and appointed counsel. Numerous continuances and a change in counsel followed.

¶ 21    On April 18, 2022, defendant, through counsel, filed an amended petition raising two claims. First, defendant claimed that his trial counsel was ineffective for (a) failing to interview and call as a witness Cedric Binion, who would have testified defendant was not involved in the shooting; and (b) failing to move to suppress his statement as involuntary "per *Gerstein v. Pugh*[, 420 U.S. 103 (1975),]" which "requires a probable cause determination within 48 hours of arrest," because the charges against him were approved 48 hours and 7 minutes after his arrest. Second,

defendant claimed that the trial court erred in admitting his statement because it was the fruit of an arrest based on an investigative alert, in violation of the Illinois Constitution.

¶ 22    Defendant attached numerous documents to the petition. Among the documents was his own affidavit, stating that, in October 2009, he informed trial counsel of Binion's existence and location, a Texas state prison. According to defendant's affidavit, Binion was "on the crimes scene when these crimes happened [and] would testify that [defendant] did not commit thes[e] crimes." Defendant further stated that, by the time of trial in 2010, Binion "had moved" to a California state prison, Binion was still willing to testify on defendant's behalf, and counsel "knew all this information before trial." According to defendant, trial counsel promised to attempt to contact Binion on several occasions, but never did so.

¶ 23    Defendant also attached Binion's 2013 affidavit, in which he stated that he witnessed Collins's murder, that defendant was "not the man whom [*sic*] committed the murder," that defendant "was not in the vicinity of the area when the crime was committed," and that, a few hours before the murder, Clark told Binion, "We finna kill [Collins]!" Binion stated that, prior to defendant's arrest, he told detectives that defendant was not the man he saw shoot Collins but, rather, Holly and Matthews shot Collins, while Epting shot Taylor. Binion further averred that he was willing to testify at defendant's trial, was never contacted by trial counsel, and remained willing to testify. He further stated that, at the time of defendant's trial, he was incarcerated "within the Federal Bureau of Prisons."

¶ 24    Defendant also attached a police report reflecting that, during a February 2007 police interview, Binion stated he observed defendant fire a handgun at "an unknown individual" during the shooting.

¶ 25    The State filed a motion to dismiss the petition. Following a hearing, the circuit court granted the State's motion on February 27, 2023. On March 14, 2023, defendant filed a motion for reconsideration, which the circuit court denied on May 31, 2023. Defendant filed a timely notice of appeal on June 2, 2023.

¶ 26    On appeal, defendant contends that the circuit court erred in granting the State's motion to dismiss his petition where he had (1) a valid claim of ineffective assistance of trial counsel and (2) a valid claim that his right against unreasonable searches and seizures was violated.

¶ 27    Under the Act, a criminal defendant may assert that his conviction and sentence were the result of a substantial denial of his rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a) (West 2022). The Act provides a three-stage process for adjudicating postconviction petitions. *People v. English*, 2013 IL 112890, ¶ 23. The instant case involves the second stage, where a *pro se* petition may be amended and the State may answer the petition or move to dismiss. 725 ILCS 5/122-5 (West 2022). To survive a motion to dismiss, the burden is on the defendant to make a "substantial showing" of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 33.

¶ 28    This court reviews the dismissal of a postconviction petition at the second stage *de novo*. *People v. Huff*, 2024 IL 128492, ¶ 13. In reviewing a petition at this stage, all well-pled facts in the petition and supporting documentation are to be taken as true, but nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient. *People v. Rissley*, 206 Ill. 2d 403, 412 (2003). A substantial showing of a constitutional violation "is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at

an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *Domagala*, 2013 IL 113688, ¶ 35.

¶ 29 Defendant first argues that the circuit court erred in granting the State's motion to dismiss because he had a valid claim of ineffective assistance of trial counsel.

¶ 30 Claims of ineffective assistance of trial counsel are cognizable in postconviction proceedings. *People v. Jones*, 191 Ill. 2d 354, 359 (2000); *People v. Dixon*, 2022 IL App (1st) 200162, ¶ 32. To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the familiar two-prong *Strickland* test: that his counsel's performance was deficient and that he was prejudiced by this deficient performance. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). At the second stage of postconviction proceedings, a defendant must make (1) a substantial showing that counsel's performance was objectively unreasonable under prevailing professional norms and (2) a substantial showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *id.* A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" of a proceeding. *Strickland*, 466 U.S. at 694.

¶ 31 Defendant asserts that his trial counsel was ineffective in two ways: by not utilizing Binion as a witness and by not filing a motion to suppress his video recorded statement based on *Gerstein*. We address these issues in turn.

¶ 32 First, defendant claims that, although he advised counsel of the existence of Binion's potential exculpatory testimony prior to trial, counsel did not investigate Binion or call him as a witness. He argues that Binion's testimony was of indispensable value to the defense where the State's two eyewitnesses, Taylor and Clark, were not credible and testified inconsistently with

each other on several crucial points, and where his own video recorded statement "carries little, if any, evidentiary weight." Defendant maintains that Binion's potential testimony—that Holly and Matthews shot Collins, Epting shot Taylor, Clark was part of the group planning to kill Collins, and defendant was not even in the vicinity when the shooting occurred—would have "contradicted and neutralized the already incredible and inconsistent testimony of Taylor and Clark *** [and] shown a motive for Clark to fabricate his version of the events to deflect from his own guilt." Defendant argues that counsel's failure to locate, interview, and call Binion to the stand was deficient and that, had Binion testified, a reasonable probability exists that the result at trial would have been different.

¶ 33     Effective assistance of counsel refers to competent, not perfect, representation. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). As such, a defendant must overcome the strong presumption that the challenged conduct was the product of sound trial strategy. *People v. Webb*, 2023 IL 128957, ¶ 22. Decisions involving which witnesses to call and what evidence to present at trial ultimately rest with trial counsel and have long been viewed as matters of trial strategy that are generally immune from claims of ineffective assistance. *People v. Coleman*, 2023 IL App (1st) 210263, ¶ 27. "[W]hen a defendant raises a claim of ineffective assistance of counsel in a postconviction petition based on counsel's failure to investigate or call a witness to testify, the petition may properly be dismissed at the second stage *** if the evidence presented in support of the claim does not make a substantial showing that counsel was ineffective." *People v. Dupree*, 2018 IL 122307, ¶ 40.

¶ 34     We cannot find that defendant has overcome the strong presumption that counsel's decision not to interview and call Binion was reasonable trial strategy.

¶ 35    First, had Binion testified, his credibility would have been subject to impeachment with his prior convictions. See Ill. R. Evid. 609(a)(1) (eff. Jan. 6, 2015) (prior convictions for crimes punishable by imprisonment in excess of one year are admissible for the purpose of attacking the credibility of a witness). The Illinois sex offender registry reflects that Binion was convicted of aggravated criminal sexual abuse of a victim under 13 years of age in 2003. See *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 36 (courts may take judicial notice of sex offender registry). According to affidavits defendant attached to his petition, Binion was incarcerated in a Texas state prison in 2009. In addition, in 2010, Binion was convicted of failing to register as a sex offender, in violation of federal law, and was sentenced to a term of imprisonment of 30 months. See *United States v. Binion*, 396 F. App'x 79 (5th Cir. 2010). Per Binion's own affidavit, he was in federal prison at the time of defendant's trial in October 2010. As such, as the State notes, had he testified, "his custodial status would have been apparent to the jury due to his prison garb." It is not improper for an attorney to choose not to interview or call a witness who could be subject to severe impeachment. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 50.

¶ 36    Second, Binion's credibility would have been subject to impeachment with a prior inconsistent statement. *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 47. One of the documents defendant attached to his petition was a police report reflecting that, during a police interview in February 2007, Binion stated he observed defendant fire a handgun at "an unknown individual" during the shooting. Had Binion, consistent with his affidavit, testified at trial that defendant was not even in the vicinity during the shooting, the State would have been able to impeach him with his contrary statement to the police. In addition to the prior statement's impeachment value, introduction of the prior statement could have been damaging to the defense, as it would have

alerted the jury that another individual had identified defendant as a shooter. An attorney is not ineffective for failing to investigate and call a witness where police reports show that the witness had earlier implicated the defendant and, therefore, it is a reasonable conclusion that the witness's testimony would probably be harmful to the defendant. See *People v. Guest*, 166 Ill. 2d 381, 400 (1995).

¶ 37    Even if we were to overlook the strong presumption that counsel's decision not to interview and call Binion was reasonable trial strategy, defendant has not made a substantial showing of a reasonable likelihood that the result of his trial would have been different had Binion taken the stand and testified consistently with his affidavit. As noted above, any such testimony by Binion would have been subject to significant impeachment. See *id.* at 400-01. Moreover, it would have stood in contrast to strong evidence of defendant's participation in the shooting.

¶ 38    This evidence included Taylor's testimony that defendant shot Collins and Clark's testimony that defendant shot at Collins. It is axiomatic that the testimony of a single eyewitness, if positive and credible, is sufficient to sustain a conviction (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)); in this case, the State presented two eyewitnesses who identified defendant as a shooter. Most notable among the evidence of defendant's guilt, though, was his own statement. "[A] confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable." *People v. Simpson*, 2015 IL 116512, ¶ 36. Here, the jury was presented with defendant's recorded statement to the police, confessing that he provided firearms to Epting and Holly for the purpose of killing Collins, armed himself, followed them to the park, and fired once or twice in Collins's direction.

¶ 39 We are mindful of defendant's argument that his confession "carries little, if any, evidentiary weight" due to his being questioned four separate times over the course of three calendar days, the physical circumstances of the interrogations, and inconsistencies between his statement and the trial testimony given by Taylor and Clark. However, defendant has cited no authority for the proposition that multiple rounds of questioning lessen the evidentiary weight of a confession; has not provided this court with the video recording of his statement, depicting the physical environment of the interviews; and, while details of his confession varied from those set forth in Taylor's and Clark's testimony, all three versions were consistent in identifying defendant as shooting at Collins.

¶ 40 Against this evidence of guilt, defendant argues that he was prejudiced by his trial counsel's failure to present Binion to testify that he was not in the vicinity of the shooting. However, as discussed, Binion would have been subject to serious impeachment had he taken the stand. Given the considerable evidence of defendant's participation in the shooting, defendant has not established a substantial showing of prejudice on this record. Accordingly, we conclude that defendant has failed to meet his burden of making a substantial showing that a reasonable probability exists that the outcome of trial would have been different had trial counsel's performance regarding Binion been different.

¶ 41 Because defendant has failed to make a substantial showing of either unreasonable performance or prejudice, his claim of ineffective assistance fails.

¶ 42 Defendant's second claim of ineffectiveness is that his trial counsel was ineffective for not filing a "*Gerstein* motion" pre-trial to suppress his statement. Noting that under *Gerstein*, 420 U.S. at 114, 125, and *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), a judicial

determination of probable cause made within 48 hours of arrest will generally pass constitutional muster, and that the charges against him were approved 48 hours and 7 minutes after his arrest, he asserts that trial counsel should have, but failed to, bring the issue to the trial court's attention. He maintains that counsel's failure to file a *Gerstein* motion "led to [him] being denied his constitutional right against unreasonable search and seizure" and that, "had such a motion been brought, [he] would have shown that his statement was involuntary and should have been suppressed." He concludes, "[Trial] counsel was ineffective for not filing the *Gerstein* motion pre-trial and moving to suppress [his] statement."

¶ 43    As an initial matter, we find, as the circuit court did, that this claim of ineffectiveness is forfeited. Defendant states in his brief, as he did in his amended petition and his response to the State's motion to dismiss, that "counsel was aware of the dates and times of both the arrest and the approval of charges as this information was available in trial discovery." Thus, defendant is not relying on any materials that are *dehors* the record in making this claim of ineffectiveness. When a postconviction claim of ineffective assistance of trial counsel is based on the record but was not raised on direct appeal, and the petition does not allege ineffective assistance of appellate counsel for failing to raise the issue, the defendant forfeits review of the issue. *People v. James*, 2023 IL App (1st) 192232, ¶ 45. Here, a claim that trial counsel was ineffective for failing to file a motion to suppress defendant's statement as involuntary based on delay between the time of arrest and approval of charges could have been raised on direct appeal, but was not, and defendant has not alleged that appellate counsel was ineffective for failing to do so. As such, the issue is forfeited.

¶ 44    Nevertheless, we note that the State has not made this argument for finding forfeiture. Regarding forfeiture, the State only argues in its brief that, to the extent defendant might be

claiming that trial counsel was ineffective for failing to seek suppression of his statement as involuntary based on a violation of section 109-1(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/109-1(a) (West 2006)), such an argument is forfeited because defendant did not raise it in the petition. Where the State fails to argue that a defendant has forfeited an issue, it forfeits the argument of forfeiture. *James*, 2023 IL App (1st) 192232, ¶ 45. As such, we will address the merits of defendant's claim.

¶ 45     The failure to file a motion to suppress is generally not a basis for a claim of ineffective assistance of counsel. *People v. Brickhouse*, 2018 IL App (3d) 150807, ¶ 40. This is because the question of whether to file a motion to suppress is traditionally considered a matter of trial strategy that is entitled to great deference. *People v. Bew*, 228 Ill. 2d 122, 128 (2008). In order to establish prejudice resulting from counsel's failure to file a motion to suppress, a defendant must show a reasonable probability both that the motion would have been granted and that the trial outcome would have been different if the evidence had been suppressed. *Id.* at 128-29. A reviewing court need not examine counsel's performance where it may dispose of a claim of ineffectiveness based on lack of prejudice. *People v. Campos*, 2019 IL App (1st) 152613, ¶ 46.

¶ 46     In *Gerstein*, the Supreme Court held that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to an "extended restraint of liberty following arrest." *Gerstein*, 420 U.S. at 114. The *Gerstein* court left the states free to fashion appropriate procedures, so long as those procedures provided a fair and reliable judicial determination of probable cause either before or "promptly" after an arrest. *Id.* at 124-25. In *McLaughlin*, the Supreme Court defined "promptly," holding that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with

the promptness requirement of *Gerstein*." *McLaughlin*, 500 U.S. at 56. However, the Supreme Court left the issue of an appropriate remedy to the states. See *People v. Willis*, 215 Ill. 2d 517, 528 (2005).

¶ 47 In Illinois, when a *Gerstein*/*McLaughlin* violation occurs, the remedy is not automatic suppression but, rather, to "ask simply whether the confession was voluntary—whether the inherently coercive atmosphere of the police station was the impetus for the confession or whether it was the product of free will." *Id.* at 535; see also *People v. Suggs*, 2016 IL App (2d) 140040, ¶ 75 (noting that "a *Gerstein*/*McLaughlin* violation is appropriately accounted for in the voluntariness analysis"). Delay is one of many factors to be considered when determining whether a confession was voluntary. See *Willis*, 215 Ill. 2d at 533, 536.

¶ 48 However, "[d]elay alone is insufficient to penalize the State by excluding incriminating statements obtained during the period between arrest and arraignment." *People v. Sterling*, 357 Ill. App. 3d 235, 248 (2005). Instead, a court must consider the totality of the circumstances surrounding a confession when determining its voluntariness, including, *inter alia*, the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; the duration of the interrogation; the presence of *Miranda* warnings; the presence of any physical or mental abuse; and the legality and duration of the detention. *Willis*, 215 Ill. 2d at 536; *People v. McArthur*, 2019 IL App (1st) 150626-B, ¶ 25.

¶ 49 Here, defendant has not identified any factor other than a 48-hour and 7-minute delay between his arrest and an approval of charges to support his assertion that his confession was involuntary. As noted, while delay is a factor to be considered in determining voluntariness, it will not, by itself, justify suppression. *Sterling*, 357 Ill. App. 3d at 248. Where defendant has not even

argued that any other factors showing involuntariness exist in his case, he has failed to make a substantial showing of a reasonable probability that a motion to suppress would have been granted. See *People v. Richardson*, 234 Ill. 2d 233, 253 (2009) ("In determining whether a statement is voluntary, a court must consider the totality of the circumstances of the particular case; no single factor is dispositive."); *People v. Ponshe*, 2024 IL App (3d) 200492-U, ¶ 30 (finding that the defendant failed to show a reasonable probability that a motion to suppress would have been granted where he cited only one factor to support his contention that his statement was involuntary); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 50    Because defendant has failed to make a substantial showing of prejudice, his claim of ineffective assistance fails.

¶ 51    Defendant's second contention on appeal is that the circuit court erred in granting the State's motion to dismiss his petition where he had a valid claim that his right against unreasonable searches and seizures under article I, section 6 of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) was violated. Specifically, defendant argues that his constitutional rights were violated when he was arrested based upon an investigative alert, as opposed to a warrant. In making this argument, defendant relies on *People v. Smith*, 2022 IL App (1st) 190691.

¶ 52    Since the parties completed briefing in the instant case, our supreme court issued its opinion in *People v. Clark*, 2024 IL 127838. The *Clark* court overruled *Smith* and held that arrests pursuant to investigative alerts do not violate the Illinois Constitution. *Id.* ¶ 63. In light of *Clark*, defendant's contention fails.

¶ 53    In summary, defendant has failed to make a substantial showing that his trial counsel provided ineffective assistance by not utilizing Binion as a witness and by not filing a motion to suppress his video recorded statement based on *Gerstein*, and has failed to make a substantial showing that he had a "valid claim" that his inculpatory statement should have been suppressed because he was arrested based upon an investigative alert. Second-stage dismissal of defendant's postconviction petition was proper.

¶ 54    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 55    Affirmed.